Charles B. McInnis and Harold A. Kertz, both of Washington, D. C., for plaintiff.

John B. Miller, of Washington, D. C., and H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

### SMITH–DOUGLASS CO., Inc. v. UNITED STATES.

No. 46289.

United States Court of Claims.

Dec. 6, 1948.

MADDEN, Judge.

This is an action for just compensation for the requisitioning, by the Government, on October 6, 1943, of the plaintiff's vessel International. The International, then named the Lake Singara, was built in 1919 by the Great Lakes Engineering Works at Ashtabula, Ohio, at a cost of $856,000. It was one of 24 identical ships built at that time for the United States Emergency Fleet Corporation. It was built as a dry cargo carrier 253.4 feet long, 43.7 feet wide and 26.2 feet deep. Its rating was 4,370 dead weight tons, 2,670 gross tons and 1,760 net tons. It is of the type known in shipping circles as a "laker." It was, however, built for ocean service, the reason it was built at a lake yard being that all ocean yards were, at the time, busy with the construction of other ships. Because it was intended that it should be taken to the ocean, it and other ships of its type were built shorter than the usual ship of its capacity, so that it could pass through the locks to get to the ocean. Because of the shortness, they were made deeper to obtain the desired capacity.

The vessel was launched and taken into the Atlantic Ocean through the Welland Canal and the St. Lawrence River. It was used for a short time in ocean cargo service, but in 1920 was laid up along with many other ships at Hog Island near Philadelphia, and remained laid up until 1928.

In that year it was purchased by the International Packing Company, of Seattle, Washington, and its name was changed to International. The packing company converted the vessel to a floating cannery, which required extensive installations for the housing of fishermen and cannery workers, for canning machinery and for the storage of canned salmon.

During the years 1928–1940 the International was based in Seattle and each year went from there in June to the Alaska salmon fishing grounds, remaining there until early in September, when it returned to Seattle with its season's product. After unloading it was moved into Lake Union, a fresh water lake connected with Puget Sound by a canal with locks, and remained moored in Lake Union until the next fishing season. A maintenance crew was on board during the time the vessel was laid up, which kept it in good repair.

On April 24, 1941, the plaintiff purchased the International from the packing company for $250,000 plus the right in the latter to use the vessel for the fishing season of 1941. Such a bareboat charter had a value of some $53,112. The packing company finally delivered the vessel to the plaintiff in September 1941, after having removed all the equipment pertaining to the canning industry. The plaintiff had the vessel reconverted to a dry cargo vessel, the use for which it was originally designed. For this reconversion the plaintiff spent some $64,000. The reconversion was completed in November 1941.

The plaintiff purchased the vessel to transport potash and other materials which it used in its business of manufacturing fertilizer, from ports on the Gulf of Mexico to its plant in Norfolk, Virginia. It realized that a shortage of shipping space was imminent, and thought that it would be advantageous to have its own vessel. It was, however, never permitted to use the vessel to transport its own materials. Instead, the ship made 11 trips to South American and Caribbean ports from Atlantic and Gulf Coast ports, three of them under private bareboat charters for which the United States Maritime Commission regulated the charges, and the other eight under time charters requisitioned by the War Shipping Administration. During the period of about two years that the vessel operated under these charters, until it was finally requisitioned by the Government on October 6, 1943, repairs, renewals and maintenance work on the vessel cost the plaintiff some $60,000 and kept the vessel in a good state of repair. During this time the vessel was classified A–1 by the American Bureau of Shipping, a reputable ship inspection service. It was inspected on July 3, 1943, by the Bureau of Marine Inspection and Navigation, an agency of the Government, and on July 3, 1943, was given a certificate permitting it to navigate all oceans for the ensuing year.

As we have said, the War Shipping Administration requisitioned the title to, and took possession of the vessel on October 6, 1943. It did this pursuant to Section 902 (a) of the Merchant Marine Act of 1936, as amended, 53 Stat. 1255, 46 U.S.C.A. § 1242(a), and Executive Order 9054 of February 7, 1942, 50 U.S.C.A.Appendix, § 1295 note. It took all spare parts and expendable equipment that were on the vessel. On July 28, 1944, it offered the plaintiff $236,018.78 as just compensation. The plaintiff rejected the offer and, on November 20, 1944, the Government paid the plaintiff $177,014.07, which was 75% of the amount offered. The plaintiff's acceptance of this sum did not, under the statute, affect its right to sue for an amount larger than the sum offered, and it has done so.

The plaintiff and the Government differ widely in their valuations of the vessel as of the time of its taking. The plaintiff has proved that the cost in 1943, of building a ship identical to the International would have been about $1,171,000. It urges that, there being no free market in ships in 1943, the only basis upon which the value of this ship can be determined for the purpose of awarding just compensation is the basis of the then cost of its reproduction new, less its depreciation over the 24 years that had then elapsed since it was built in 1919. On this basis, and applying a depreciation rate of 3% on a diminishing balance, the plaintiff seeks a judgment for $586,592.05 for the vessel, and the spare parts that were taken with it. The Commissioner of this court, using

the same method but a 4% depreciation rate, arrived at a value of $434,445.99.

The Government, on the other hand, asserts that there was, in 1941 and 1942 a market for ships like the International; that the market price when there was a market was about $250,000, which was the average of the prices at which five such ships were sold; that the price of ships was lower in 1943 than it had been in 1941 and 1942, and hence the $250,000 price would be just compensation. The Government urges also that if 1943 value is to be determined on the basis of the cost of reproduction new, less depreciation, the rate of depreciation should be 5%. Applying this rate to the somewhat lower cost of reproduction new for which the Government contends, a 1943 value of about $265,000 is obtained.

We think that the cost of reproduction new less depreciation method of determining value for the purpose of giving just compensation is extremely unsatisfactory when applied to cases of this kind. It assumes a permanence and a regularity of market over a long period of years which has never existed in regard to ships. During the more than two decades of the life of the International, the price per ton of shipping has varied from figures approaching zero to a price of some $60 a ton admitted by the Government, with the plaintiff claiming a price of about $130 a ton. With such variations, any relation between any asserted price and the cost of reproduction new less depreciation is either largely accidental or is produced by varying the percentage of depreciation in order to produce a result not too irrational for possible acceptance. By applying reproduction new less depreciation, the International, built in 1919 at a cost of $856,000, would have been worth most of that amount during the years 1920 to 1928. In fact its dollar value was substantially nothing, and it was laid up, along with numerous other ships, because no one would give anything for them. These were prosperous years, but ships were in over supply because so many had been built during and immediately after the First World War. In 1939 the market value of the ship was some $88,000 and there is no reason to suppose that it had been higher than that during any of the years 1928–1939. With twenty of the twenty-four years of the life of the International before she was requisitioned elapsed, we see that in none of those years was there the slightest correlation between cost of reproduction less depreciation and market value. This experience argues strongly against any thought that cost of reproduction new less depreciation, and market value are, by and large, about the same so that in the absence of an actual market the other method may be expected to give a result fairly comparable to what the market value would have been, if there had been a market. And it argues that, to avoid purely capricious valuations having no relation to true value, every effort should be made to bridge across the gap during which there was no market by projecting the former market, if it was not too remote, on the trend shown by the evidence, or of which we are judicially aware, thus reaching, as nearly as we can, the figure that we think a willing buyer would have given a willing seller for the ship.

We recognize, of course, that reproduction new less depreciation is a useful aid in determining the value of property such as public utility plant and equipment which is, normally, used and used up in the service and which, if removed, would have to be replaced at the then cost of construction, in order that the service continue. The protected monopoly market of the product of the utility gives assurance of the continuing ability of its equipment to earn an income. History shows that none of these elements of stability exist for ships such as the International.

We look now to the evidence of market value of the International on October 6, 1943. There were five sales of comparable ships in 1941 and 1942, and the average price was $250,000. Because of the volume of ship construction which had been attained by that time, and the fact that the submarine menace had been greatly diminished, the trend in ship prices was downward, and prices were somewhat lower than in 1942. On the basis of those facts, the market values of 1941 and 1942, when there was a market, seem to us to be the

most dependable evidence of the value of the International on October 6, 1943. We have no idea that a willing buyer would, in those days when it was fairly evident that what would be an enormous excess of cargo shipping was being built up, which in time would be as useless as the similar excess after the First World War, would have paid any such price as the plaintiff claims, for a ship 24 years old and of unconventional design. He could not have expected to get his investment out of the ship during the period of inflated values. The plaintiff had bought the International in 1941 for its own use, but it had never been allowed to use it, as the Government required that it be diverted to more important uses. It made no profit out of its chartered voyages, because the Government dictated the rates that it could charge. With no prospect of even a temporary operating profit, and with a clear likelihood of an almost total capital loss, we think that a prudent buyer would have paid no more attention to cost of reproduction new less depreciation than buyers had done in all previous years. The plaintiff on July 17, 1943, on its own books charged off depreciation at the rate of 25% per annum with the explanatory note "In view of the present shipbuilding program this vessel will be obsolete at the termination of the war and will be vitually worthless." Although this large charge-off for depreciation was abandoned, it is interesting evidence of the opinion of the plaintiff's agents four months before the taking.

The International, because of its nonuse and limited use for so many of its years, and because it had been unusually well maintained and much of its interior construction was new, and because it had a more than ordinary complement of spare parts, was, we think, worth somewhat more than the average ship of its tonnage. Without pretending to any mathematical accuracy which we do not feel, we conclude that the value of the International and its equipment and spare parts on October 6, 1943, was $290,000, and that that is the measure of just compensation for its taking. The plaintiff is, therefore, entitled to recover interest, as a part of just compensation, at 4% per annum on $290,-000 from October 6, 1943, to November 20, 1944, on which date the Government paid the plaintiff $177,014.07. The plaintiff is further entitled to recover $112,-985.93, the difference between $290,000, and $177,014.07, and interest at 4% per annum on $112,985.93 from November 21, 1944, to the date of payment of the judgment rendered herein.

It is so ordered.