**GARTLAND S. S. CO. v. UNITED STATES.**

**No. 47753.**

United States Court of Claims.

July 9, 1951.

588

Ira L. Ewers, Washington, D. C., for the plaintiff. Robert H. Duff, Washington, D. C., on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge, for the defendant.

Before JONES, Chief Judge, and LIT-TLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

The plaintiff sues for just compensation for three cargo vessels which the War Shipping Administrator requisitioned from it in 1942. The Government in 1943 advanced a certain amount to the plaintiff under an agreement that if, when the Government finally made its offer of compensation, the plaintiff should reject it as inadequate, the plaintiff would return all of the amount advanced except the seventy-five percent of the amount of the offer, which percent it was entitled to retain without prejudice to its right to sue for more. Section 902, Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1242 (d). In 1945 the Government made its offer, the plaintiff in 1947 rejected it returned the excess of the amount advanced over seventy-five percent of the offer, and initiated this suit.

The three ships in question were the Brockton and the Back Bay, both built in 1908 and the Bennington, built in 1897. All were steel ships, with coal-burning engines, of approximately 3,500 deadweight tons. They had been built for service in the Great Lakes, and were operating there when they were requisitioned. The details of their construction and of any special equipment which they carried, are given in findings 8, 9, and 10.

We have, as is usual in these ship requisition cases, the problem of finding some reasonably trustworthy basis for arriving at a valuation. No comparable ships were sold in 1942, so we have no direct marketplace evidence of value. Five ships of the same type were sold in 1941, when, as we have found, market conditions were substantially the same as in 1942, but those ships were built in 1918 and 1919, and were therefore more valuable than the plaintiff's older ships. The plaintiff says that in these circumstances we must value the ships by taking what would be their cost of reproduction new in 1942, and depreciating it for their age on an assumption of a useful life of at least fifty years. In the case of Smith-Douglass Co., Inc. v. United States, ct. cl., 81 F.Supp. 215, this Court pointed out the frequent lack of correlation between a value arrived at by

this method, and the amount which a willing buyer would actually pay for a ship. That lack of correlation is evident in this case. The results which would be arrived at by that method would place a substantially higher value per dead-weight ton upon the plaintiff's ships in 1942 than buyers and sellers placed in 1941 upon comparable ships ten years younger and equally well maintained. Such a result would contradict experience, and we will not adopt that method of valuation.

■ An expert for the Government made a computation which showed that the market price of the five ships sold in 1941 was equal to the then cost of their reproduction, depreciated for their age at five percent per annum computed upon a diminishing balance. We recognize that this computation, made after the event, may show nothing more than an accidental correlation between the result reached by the computation and the actual market price. But we think it shows, for this type of ship, at least a rough correspondence between that method of depreciation and the market price. It gives us a value for the ships which seems to be in reasonable proportion to the price at which the younger ships were marketed in 1941. In the absence of any better test, therefore, we adopt it. The resulting figures are shown in finding 18. To these figures have been added the value of the special equipment on two of the ships, properly depreciated. Our final valuations appear in finding 19.

The Government urges that the figures which we have arrived at should be greatly reduced by subtracting from them a large part of the sums spent by the Government upon the ships after they were requisitioned. It recognizes that, of the amounts shown in finding 13 as so expended, a considerable part was for the conversion of the ships for ocean wartime trading, but it urges that the remainder was spent to put the ships in sound operating condition, and should therefore be deducted from the depreciated reproduction cost, since that computation assumes that the ship in question, though old, is in running order.

■ We do not agree with the Government's contention. The ships were, in fact, operating when they were requisitioned. Each held a classification of "100," the highest classification of the American Bureau of Shipping issued to ships operating on the Great Lakes. Each vessel had a current one-year certificate of inspection to operate on the Great Lakes, issued by the Bureau of Marine Inspection and Navigation, United States Department of Commerce. As to two of the ships, these certificates had been issued only some two months before their requisition. A thoroughgoing special survey required of vessels on the Great Lakes at five-year intervals had been undergone by two of the vessels a little more than a year before their requisition, and by the other one only three months before its requisition. For this survey, the vessel is drydocked, and the intensive examination described in finding 12 is made. In addition, these vessels, like those of all operators on the Great Lakes, had only emerged from their winter lay-up some three months before their requisition. During the lay-up the vessels were overhauled to make sure that they could operate without interruption during the busy and profitable shipping season.

What seems to have happened is that the Government, in having extensive alterations made to convert the vessels for ocean wartime trading, uncovered things which, when uncovered, showed the effects of age and wear, but which had not caused any trouble and which a prudent owner would not have dismantled his vessel to get at. Once the vessel was dismantled for the Government's other purposes, perhaps it was economical to replace such parts. But their existence had not kept the vessels from being in sound operating condition when requisitioned.

■ We have allowed the plaintiff interest at the rate of four percent per annum upon the amount we have awarded in excess of the amount advanced by the Government. Though there is no statutory basis for the award of interest, and therefore no rate fixed by statute, the Supreme Court of the United States in the

590

Seaboard Airline Railway Company case (Seaboard Airline Railway Company v. United States), 261 U.S. 299, 43 S.Ct. 354, 67 L.Ed. 664, held that the requirement of the Fifth Amendment of the Constitution, that just compensation be paid for property taken for public use, included the requirement that compensation be paid for delay in payment of the compensation after the property had been taken. And in Brooks-Scanlon Corp. v. United States, 265 U. S. 106, 123, 44 S.Ct. 471, 474, 68 L.Ed. 934, the Court said, "Interest at a proper rate is a good measure of the amount to be added." In recent years this Court has been allowing interest at the rate of four percent as a part of just compensation. See Arkansas Valley Ry. v. United States, 68 F.Supp. 727, 107 Ct.Cl. 240, 259.

The Government urges that the rate of interest as a part of just compensation should not exceed two-and-one-half percent. The data offered in evidence by the Government is summarized in finding 20. It does show that if the greatest security of principal were the only desideratum in the investment of one's funds, a yield of only about two-and-one-half percent could be expected. But the persons, natural or juridical whose property is taken by the Government for public use, and who have to wait, in the instant case nine years, for their payment, are not all and not generally widows, or trustees restricted by law to extremely safe investments with low yields of income. This plaintiff had its money invested in ships, an enterprise of considerable hazard whose profit, if any, would have to exceed two-and-one-half percent in order to obtain capital. And if the plaintiff could borrow money to replace that withheld by the Government, it could not borrow it at two-and-one-half percent on the credit of the ship business. A claim such as the instant one, which has been contested by the debtor, should when won, carry a higher rate of interest than an admitted obligation such as a Government bond. We think that four percent is a fair rate of interest, as a part of just compensation.

The plaintiff is entitled to recover $267,691.20, plus interest at the rate of four percent per annum on $151,398.13 from June 24, 1942 to October 7, 1943, and interest at the same rate on $273,793.07 ($81,799.90 plus $191,993.17) from July 6, 1942 to October 7, 1943; plus interest at the same rate on $215,671.20 ($425,191.20 less $209,520) from October 7, 1943 to July 16, 1947; plus interest at the same rate on $267,691.20 ($215,671.20 plus $52,020) from July 16, 1947 until date of payment.[1]

It is so ordered.

---

1. See findings 4, 5, 6, 7, and 19 for the facts constituting the bases of this computation.