ERICSSON LINE, as Owner of the American Steamship John Cadwalader,

v.

The UNITED STATES.

THE JOHN CADWALADER.

No. 48749.

United States Court of Claims.
April 3, 1956.

Clement C. Rinehart, New York City, Elmer C. Maddy and Kirlin, Campbell & Keating, New York City, on the briefs, for plaintiff.

Mary K. Fagan, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This suit involves the value of the vessel The John Cadwalader, her stores, expendable equipment, and spare parts, on July 22, 1942.

On July 22, 1942, the War Shipping Administration, pursuant to section 902, of the Merchant Marine Act of 1936, as amended, 53 Stat. 1255, 46 U.S.C.A. § 1242, and Executive Order 9054, 7 Fed. Reg. 837, U.S.Code Cong.Service 1942, p. 154, requisitioned title to and took pos-

session of the vessel, together with her consumable stores, expendable equipment, and spare parts. Plaintiff was the sole owner of the vessel as of that date. Defendant has neither paid nor tendered any amount to plaintiff as just compensation for the requisition and taking of its property, except the sum of $748.18 which was paid to plaintiff for unbroached consumable stores. The record does not reveal the reason for defendant's failure to make payment.

Plaintiff asserts that the reasonable value of the vessel was, at the time of taking, not less than $475,000, and it seeks to recover that sum together with $375.40 for broached consumable stores. Plaintiff also seeks interest from the date of taking to the date of payment of the judgment as a part of just compensation.

The John Cadwalader was specifically designed and built in 1926 for use as a combination passenger and freight vessel in overnight daily service between Philadelphia and Baltimore, via the Chesapeake and Delaware Canal; and she was so operated for about ten years, from 1926 to 1936. While so operated her passenger accommodations consisted of 85 staterooms and 158 berths and she was licensed to carry 275 overnight passengers. The vessel's hull was constructed of steel and her superstructure, above the main deck and waist, was constructed of wood. A full description is set out in finding 6.

The actual purchase price of the vessel delivered to the Baltimore & Philadelphia Steamship Company, the original owner, was $395,966.81 in 1926.

From 1926 until 1931 the Baltimore & Philadelphia Steamship Company operated The John Cadwalader as a combination passenger and freight vessel in its overnight service between Philadelphia and Baltimore. From 1931 until 1935 the vessel was chartered to plaintiff and continued in the same service as a combination passenger and freight vessel. In 1935, after the Baltimore & Philadelphia Steamship Company got into financial difficulties and the Philadelphia National Bank foreclosed a mortgage of $350,000 which it held on The John Cadwalader, plaintiff purchased the vessel from the bank at auction for the sum of $55,000, free and clear of all liens.

Plaintiff continued to operate the vessel as a combination passenger and freight vessel for about one year and then discontinued the passenger phase of the operation, and thereafter confined its business to the transportation of freight. In 1938 or 1939 the vessel underwent certain alterations to increase its freight capacity. Plaintiff continued its freight service until November 15, 1941, at which time the vessel was laid up in Philadelphia. It remained in dry dock until requisitioned on July 22, 1942, by defendant.

In support of the figure of $475,000 which it claims was the value of The John Cadwalader when requisitioned, plaintiff relies principally upon testimony as to reproduction cost on the date of requisition less depreciation. It is plaintiff's position that the present case is closely analogous to the Baltimore Steam Packet Company cases, (Baltimore Steam Packet Co. v. U. S.) 81 F.Supp. 707, 711, 715 and 713, 112 Ct.Cl. 433, 448, 458, and 469, in which this court, while considering other factors, placed particular emphasis on cost of reproduction less depreciation in arriving at a figure for just compensation for the vessels taken.

While we agree that cost of reproduction less depreciation may be a factor to be considered in determining the value of The John Cadwalader, we do not feel that the Baltimore Steam Packet cases are necessarily controlling in the present situation nor do we believe that this court is bound to employ any standard formulae or method in determining the value of the vessel. As was stated by this court in the first Baltimore Steam Packet Company case, 81 F.Supp. 707, 710, 112 Ct.Cl. 433, 445:

"While formulae may be useful as guide posts, they are not controlling. Each vessel is an individual thing and its value at the time of the taking must be determined from all the

evidence in the record and in the light of conditions then existing."

The John Cadwalader differed from the vessels in the Steam Packet cases in several respects, one being its smaller size, and certain evidence which appears in the present record is different from the evidence in the Steam Packet cases. In establishing a fair and reasonable value for The John Cadwalader, the court must consider and weigh all the evidence in the record before it.

There were no sales of vessels comparable to The John Cadwalader in the open market in 1941 or 1942 from which the market value of the vessel can be established as of July 22, 1942. Mr. Rutland, one of defendant's valuation witnesses, arrived at a figure of $48,447 as the value of The John Cadwalader by considering the records of the War Shipping Administration regarding the sale or transfer of seven other vessels. However, the vessels selected by Mr. Rutland were not comparable to The John Cadwalader and little weight can be given his testimony.

Plaintiff produced three valuation witnesses who expressed opinions as to the value of The John Cadwalader when requisitioned. Each of these witnesses formed his opinion by estimating the cost of reproducing the vessel new in 1942, and substracting from this estimated cost an allowance for depreciation. Certain other items were also deducted, such as the estimated cost of repairs needed at the time of requisition. A full explanation of the method of valuation employed by these witnesses is set out in findings 23, 24, and 25.

The average of the valuations placed upon The John Cadwalader by plaintiff's three witnesses is $478,097 and plaintiff relies chiefly upon their testimony to substantiate its position that the value of the vessel was not less than $475,000 when taken by the defendant. We have given careful consideration to the testimony of these witnesses and we do not feel that the method used by them reflects the true value of the vessel on the date of its requisition. It is unrealistic to place particular emphasis upon the reproduction cost of the vessel when it is very unlikely that a prudent person would have undertaken to reproduce such a vessel in 1942. At the time of its taking The John Cadwalader had been in dry dock for about eight months and had earned nothing during this period. Its earnings for a considerable period prior to requisition had been small and its prospects for the future were not bright. It had been designed for a particular purpose, i. e., passenger and freight service between Philadelphia and Baltimore, and the uses to which it could be put were limited. For several years prior to 1942 there had been an increasing amount of truck competition for the freight trade of vessels like The John Cadwalader. Furthermore, the costs of labor and materials were extremely high in 1942. For these reasons we do not believe that a prudent person would have attempted to reproduce such a vessel, nor would a prudent buyer have paid any attention to cost of reproduction new less depreciation, and we cannot agree that this method of valuation is satisfactory in the present situation.

Captain Robert Guiler, a witness for the defendant, stated that in his opinion The John Cadwalader was worth not more than $75,000 when taken by the defendant. Captain Guiler appraised a large number of vessels of various types during the war while senior member of the Joint Merchant Vessel Board. He inspected The John Cadwalader on two occasions, once in 1939 and again in 1940. He based his opinion as to its value mainly upon his inspection of the vessel, his experience in appraising other vessels, and his discussions with commercial operators in the Philadelphia area. Although Captain Guiler is not an expert in the ship appraisal field, his opinion is of some value in view of his wide experience and personal inspection of the vessel.

In 1938 plaintiff reduced the amount of insurance carried on The John Cadwalader from $200,000 to $187,500. The insurance coverage was again reduced in 1940 to $125,000 and remained at that

figure until the vessel was requisitioned. While insurance coverage alone is not generally an accurate guide in establishing the value of property, it is a factor to be weighed along with all others in determining just compensation.

Another factor which the court has considered is the earning record of The John Cadwalader prior to its requisition. A table of plaintiff's operating revenue and expense appears in finding 19. For the six years prior to requisition plaintiff's net revenue averaged about $19,000 per year before taxes. It is difficult to determine what proportion of the net income should be attributed to The John Cadwalader because the plaintiff did not keep records on a ship-by-ship basis. However, it is clear that at least one other vessel contributed to the earnings each year and that part of the revenue was derived from sources other than operation of the vessels, such as terminal facilities and dock equipment. After considering all the evidence in the record as to earnings, we feel that it is reasonable to conclude that the earnings of The John Cadwalader averaged between $10,000 and $12,000 per annum before taxes for the six years prior to its taking. We feel that this earning record does not justify the high valuation which the plaintiff urges for the vessel.

Furthermore, the vessel's earning prospects for the future were not good at the time of its requisition. Before the war the vessel had been engaged chiefly in a limited operation in collaboration with the Bull Lines in their coastal and island trade. Due to the wartime cutailment of the operations of the Bull Lines and increasing truck competition, the volume of freight declined to such an extent that the vessel was laid up and remained in dry dock for eight months before being requisitioned. Apparently there was not enough freight business to keep the vessel operating between Baltimore and Philadelphia without the Bull Lines connection, and it is noted that when the Bull Lines resumed operations, no replacement was made for The John Cadwalader or for the service

it performed. Nor does the record reveal any attempt by plaintiff to reconvert the vessel for passenger trade, and we must conclude that no great demand existed for that type of service. Although the evidence indicates that some use might have been found for The John Cadwalader, it does not appear that her potential earning ability justifies the high valuation which plaintiff seeks.

Still another factor which the court has considered involves a sale of stock in the plaintiff company. In January 1941 85 percent of the stock in the plaintiff company was owned by the A. H. Bull Steamship Company and the remaining 15 percent was owned by the Chesapeake & Delaware Steamboat Company. On that date the Bull Company purchased the stock owned by the Chesapeake & Delaware Company for $25,000 in what was described by an officer of the Bull Company as an "arm's-length transaction." At the time the stock was sold the assets of the company, not including The John Cadwalader which was its principal asset, slightly exceeded its liabilities. This indicates that the net worth of the company was represented primarily by The John Cadwalader. Assuming that $25,000 represented the fair value of 15 percent of the stock in the plaintiff company, then the value of all the stock would appear to have been approximately $166,650, and it is unlikely that the value of The John Cadwalader would have varied greatly from that amount. We realize that a sale of stock may not accurately reflect value because of the numerous factors which may be involved in such a transaction. However, after examining all the evidence, it is our opinion that the sale of the stock bears a relation to the value of the vessel in the present situation.

When requisitioned The John Cadwalader was in need of repairs that would have cost an estimated $21,430, but it was otherwise in good condition.

The expendable equipment and spare parts taken by the defendant, if considered separate and apart from the vessel, would have a fair value of $16,265.64.

However, part of the equipment taken consisted of items such as anchors and bells which form an integral part of any vessel and these items, as well as the spare parts, would normally be considered as part of the vessel on either sale or bareboat charter. Therefore, we did not consider the expendable equipment and spare parts as being separate from the vessel, but instead made allowance for their value in arriving at a figure for just compensation.

After considering and weighing all factors in evidence in the entire record including the opinion evidence of the various witnesses, the physical condition and age of the vessel, the amount of insurance carried, the type of service in which the vessel had been engaged, its past earning record, its potential earning ability, and the sale of stock in the plaintiff company, it is our opinion that the value of the vessel together with its expendable equipment and spare parts was $160,000 on July 22, 1942.

Also taken by defendant were certain consumable stores which were on board The John Cadwalader when it was requisitioned. Defendant paid plaintiff $748.-18 which was the fair value of the unbroached consumable stores taken. However, no amount was paid plaintiff for broached consumable stores. These stores had a fair and reasonable value of $375.40 which should be added to the value of the vessel, her spare parts and expendable equipment, making a total of $160,375.40.

Plaintiff also seeks interest from the time of the taking to the date of payment of the judgment as a part of just compensation, basing its claim upon defendant's failure to comply with subparagraph (d) of section 902 of the Merchant Marine Act, as amended, 53 Stat. 1256, which reads as follows:

"In all cases, the just compensation authorized by this section shall be determined and paid by the Commission as soon as practicable, but if the amount of just compensation determined by the Commission is un-satisfactory to the person entitled thereto, such person shall be paid 75 per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum will make up such amount as will be just compensation therefor * * *."

There is no explanation in the record as to why defendant failed to determine and tender just compensation in compliance with its statutory duty. On the other hand, there is no evidence that plaintiff made any request for payment or made any inquiry as to why payment had not been made between the time of the taking and the time of the filing of its petition. Plaintiff's petition was not filed until July 21, 1948, one day less than six years after the vessel was requisitioned. After the case was referred to a commissioner of the court on July 21, 1948, numerous delays occurred in presenting evidence and the case was not tried until February 2, 1956.

In awarding just compensation the court will include such additional amount beyond the value of the property taken as will be fair and proper in the light of all the circumstances. As stated by the Supreme Court in Shoshone Tribe of Indians v. United States, 299 U.S. 476, 496, 57 S.Ct. 244, 251, 81 L.Ed. 360:

" * * * The claimant's damages include such additional amount beyond the value of its property right when taken by the government as may be necessary to the award of just compensation, the increment to be measured either by interest on the value or by such other standard as may be suitable in the light of all the circumstances."

It is clear that defendant breached its statutory duty by failing to make payment as soon as practicable after the vessel was requisitioned. However, plaintiff could have minimized its damages by action within a reasonable time. Instead it did not file its petition for almost six years, and then made little attempt to expedite the matter, so that the

case was not tried until 13½ years after the requisition. As set out in our finding 30 it appears that both parties shared the responsibility for the delay in bringing the case to trial. In the light of all the circumstances we feel that as a part of just compensation plaintiff should receive interest at a rate of 3 percent per annum on the amount of this judgment from the time of the taking until payment of the judgment.

Judgment will be entered in favor of plaintiff in the sum of $160,375.40 with interest at 3 percent per annum from July 22, 1942, until date of payment.

It is so ordered.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

Courtney J. ODELL, Also Known as Casimir J. Odrovonz

v.

The UNITED STATES.

No. 145–55.

United States Court of Claims.

April 3, 1956.

James K. Foley, Washington, D. C., for plaintiff. Edgar A. Wren and Gardiner, Wren & Gardiner, Washington, D. C., were on the briefs.

Kathryn H. Baldwin, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The Government has made a motion to dismiss the plaintiff's petition, asserting that the petition shows on its face that the claim asserted in it is barred by the statute of limitations, 28 U.S.C. § 2501. On November 8, 1955, the court rendered an opinion granting defendant's motion and dismissing plaintiff's petition. The case is now before us on plaintiff's motion for rehearing.

The plaintiff sues for retired pay to which he says he is entitled because of a disability incurred by him in military service. He entered on active duty in 1941 as a lieutenant colonel. On February 8, 1946, he appeared before an Army Disposition Board which found that he had a duodenal peptic ulcer which existed prior to his entry on active duty, but which was permanently aggravated by his military service. On March 7, 1946, he appeared before an Army Retiring Board which found that he had a duodenal peptic ulcer, that it was service incurred, and aggravated by service.