Petition of the UNITED STATES of
America, a sovereign nation, as owner
of the UNITED STATES COAST
GUARD VESSEL INVINCIBLE, Offi-
cial Number 52300, for exoneration
from or limitation of liability.

Civ. No. 62–23.

United States District Court
D. Oregon.

Dec. 20, 1963.

Douglas M. Fryer, Atty. Admiralty &
Shipping Section, Dept. of Justice, Seat-
tle, Wash., and Sidney I. Lezak, Acting
U. S. Atty., Portland, Or., for petitioner.

James R. Ellis and John A. Gose, of
Preston, Thorgrimson, Horowitz, Starin
& Ellis, Seattle, Wash., and A. E. Glick-
man, Milwaukie, Or., for claimants.

KILKENNY, District Judge.

This subject is now before the Court
on issues framed under the general law
of salvage as presented in a Supplemental
Pre-Trial Order. The Opinion in the
original libel reported in The Petition
of the United States of America, etc.,
216 F.Supp. 775 (D.C.Or.1963) gives a
complete history of the attempted sea
rescue which resulted in tragedy for all
involved.

A brief resume of important facts will
be of benefit to an understanding of my
ultimate conclusions.

The fishing vessel BARBARA LEE, on the afternoon of January 28, 1960, capsized while attempting to save the disabled United States Coast Guard Vessel INVINCIBLE and her crew. The BARBARA LEE was heavily damaged and her skipper, Robert Bolam, and a crewman, Ted Arnold Sigurdson, were drowned. Previously, the INVINCIBLE was disabled by a large "sneak wave", which washed her engine and so damaged her radio as to prevent it from transmitting. After this casualty the INVINCIBLE was completely helpless and was nothing more than an incapacitated derelict in an exceptionally heavy sea. Her four seamen were in a state of shock and confusion. At the moment she was entirely impotent and her crew was in extreme peril. This fact was recognized by the skipper and crew of the BARBARA LEE, which vessel had crossed the Grays Harbor Bar, but was in a position of safety at the time. Nevertheless, the master and crew of the BARBARA LEE, guided by one of the highest instincts in human nature, forthwith accepted an invitation for assistance which had been extended by the master and the crew of the INVINCIBLE. They left their position of safety, behind the lea of the westerly end of the south jetty, to return to the dangerous waters of the Bar. When the BARBARA LEE came alongside the INVINCIBLE, the skipper requested the BARBARA LEE to call the Coast Guard Station at Westport. Crewman Sigurdson made the radio call to the station advising them of the great peril of the INVINCIBLE. The station forthwith responded with a radio demand that the BARBARA LEE throw a tow line to the INVINCIBLE with the hope of bringing her behind the lea of the jetty or at least keeping her out of more dangerous waters.

Upon receipt of the radio message from the BARBARA LEE, the Coast Guard Station dispatched a 36-footer from that station, the McLANE from Aberdeen and the YOCONA from Astoria, all to assist in the rescue of the INVINCIBLE. While this aid was on its way, the BARBARA LEE had thrown a line to the INVINCIBLE and for thirty very critical minutes engaged in an effort to hold and tow that vessel. This was an exceptionally dangerous undertaking for a small fishing boat which was not equipped for towing, and considering the task, was an exceptionally light vessel. The tow line broke during the first attempt. Nevertheless, the skipper and crew of the BARBARA LEE took the INVINCIBLE in tow for a second time and it was during this latter effort that an exceptionally large wave caught and completely capsized the BARBARA LEE. Immediately thereafter the INVINCIBLE drifted across the dangerous north spit area and anchored in the darkness. When the 36-footer dispatched from Westport, in response to the radio call, reached the INVINCIBLE, a tow line was put aboard and the anchor chain was cut loose. The motor then failed on the 36-footer. Both vessels were then adrift without radio or lights. Sometime later the McLANE happened on the two vessels and ultimately towed the INVINCIBLE to a port of safety at Neah Bay. The skipper of the INVINCIBLE was removed from his vessel to the YOCANA, the other crew members remaining until it reached the Bay. On all of the facts in the case, I find that the INVINCIBLE and all of her crew were saved as a direct and proximate result of the combined salvage effort, the radio call from the BARBARA LEE being the principal factor.

## LAW OF SALVAGE

A deep study and thorough analysis of the numerous cases cited by proctors serves only the beneficial purpose of demonstrating that the tangents of salvage law are so inexact, and so incapable of precise evaluation, that it would be useless to attempt a reconciliation of the case law on the subject.

Perhaps, Judge Clifford, in his opinion in THE BLACKWALL, 10 Wall. 1, 77 U.S. 1, 14, 19 L.Ed. 870 (1869), came as close to an exact formula, as the inexactness of salvage law permits, when speak-

ing of the amount of a salvage award said:

"Courts of admiralty usually consider the following circumstances as the main ingredients in determining the amount of the reward to be decreed for a salvage service: (1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued."

Obviously, the foremost problem of the trial judge is to determine the sound value of the salved property, in this case the INVINCIBLE. As usual, the opinions of the experts are at cross-purposes and in hopeless conflict. The case law on the subject not only sharpens the problem of how laborious the valuation issue may become, when a valuable ship has been salved, but also pinpoints the very untechnical manner in which the expert testimony must be handled. The items generally taken into account in finding the sound value of salved property are ship, freight and cargo. Here, we are concerned only with the ship. Under ordinary circumstances, it is customary to estimate the sound value of the ship, that is, its market value before the catastrophe or other cause of damage. Customarily, value would be established by the value of the ship on the open market. That rule assumes that the ship was one constructed for usual and ordinarily commercial or pleasure uses and the existence of a ready or open market. On the record before me, the evidence is clear that the INVINCIBLE was a unique vessel, specially designed and built for the Coast Guard Lifeboat and Rescue Service. The vessel was still in service and in good condition at the time of the trial, although constructed in 1935. It being a specially constructed and designed ship, having a value only for a special purpose, the customary rule would not be applicable and the Court must look to replacement value, less depreciation. An expert witness for the petitioner testified that there was a limited market for the INVINCIBLE and that in his opinion the reasonable market value thereof was $17,000.00. However, he conceded that the market for this type of vessel would be confined to a very few applications. I agree with the conclusion of the claimants' expert that the market value for a vessel such as the INVINCIBLE is so limited that the customary rule is not an appropriate one to apply. On replacement value less depreciation, the petitioner's expert arrived at a figure of $45,360.00, as the value of the INVINCIBLE. Using the general formula, the expert for the claimants arrived at a figure of $86,000.00. The parties agree that the original cost of the INVINCIBLE in 1935 was $80,000.00. It is asserted that the cost of the vessel was exceptionally low, for the reason that it was built in a Government Yard, and that it would have cost approximately twice that sum if built in a commercial yard. Although of no significance in my decision on the subject, I would have great difficulty in following the logic of this conclusion. From my experience, and it is not inconsequential, the Government has yet to reach the plateau of competitive responsibility, where it can build anything, ships or otherwise, at a cost less than that of private industry.

On all of the evidence in the case, I fix the value of the INVINCIBLE at the time of the catastrophe at $80,000.00.

From the stage of fixing the value of the property, I must now pass to an evaluation of what has been called "the moral aspects of the salvage service". Factors to be taken into consideration on this valuation, among other things, are: (1) the value of the salving ships, (2) the promptness with which the service was rendered, (3) the time

consumed in completing the salvage, (4) the degree of skill or ingenuity required or manifested, (5) the extent of the danger from which the salved vessel was rescued, (6) the peril which attended the work of the salvors, and (7) in particular the extraordinary courage and heroism on the part of members of the salving crews and their officers. It has been said that the trial court in passing on the moral worth of the salvage service is "operating on plastic materials which he can shape to suit his own fancy". To be taken into consideration is the fact that the salvor, such as the BARBARA LEE and her master and crew, may suffer loss or damage in attempting to effect the salvage. In such a case the cost of repair or the damage suffered by the salving vessel may be included in the award, or, as is more frequently done, stated as an item of recovery in addition to the award.[1]

In a case such as this, it is my belief that the total salvage award should be divided into (1) a basic amount consisting of the general reward for meritorious services, to be divided among all those participating in the salvage effort, and (2) a special award to reimburse particular salvors for a part of expenses, damages or injuries incurred in performing the salvage operation. THE KANAWHA, D.C., 254 F. 762.

## BASIC AWARD

 It is my considered judgment, and I find, that the basic award should be 50% of the value of the INVINCIBLE or $40,000.00. Participating in this award should be the vessels of the Coast Guard, the 36-footer, the McLANE and the YOCONA and their crews and the BARBARA LEE and her crew.

In the application of the formula expounded by Judge Clifford to the facts in this case, I find that five of the six main ingredients are favorable to a large percentage of the award going to the BARBARA LEE and her crew. These are: (1) The heroic labor expended by the crew of the BARBARA LEE was far in excess of any shown by the crew of the Coast Guard vessels. (2) The promptitude, skill and energy displayed by the crew of the BARBARA LEE, in attempting to save the INVINCIBLE, was far above and beyond anything shown by the crews of the Coast Guard vessels. (3) Although the value of the BARBARA LEE—here fixed at $60,000.00—did not compare with the value of the Coast Guard vessels—here fixed at $1,778,-700.00—the danger to which the BARBARA LEE was exposed was far greater than any of the Coast Guard vessels. The 36-footer floundered because of defective equipment, and her assistance was of minor importance. (4) I have already expressed my views on the exceptional valor of the crew of the BARBARA LEE in leaving a place of safety, and entering a savage and destructive sea, with the one thought in mind, i. e., answering the call of vessel and fellow seamen in distress. On the other hand, the crews of the Coast Guard vessels were merely doing their duty. (5) There is no showing of an exceptional danger in the area from which the INVINCIBLE was eventually rescued. Furthermore, if it had not been for the original radio message from the crew of the BARBARA LEE to the Coast Guard Station and a relay of that message to the McLANE, there is no doubt but that the INVINCIBLE and the 36-footer would eventually have beached and broken up in the same manner as the BARBARA LEE. The great weight of the evidence forces a conclusion that the outstanding acts in the salving operation was the radio message to the Coast Guard Station, and, the valiant one-half hour struggle between the BARBARA LEE and the sea, which effort gave sufficient time for the Government vessels to reach the INVINCIBLE before beaching.

I find that 10% of the basic award, or $4,000.00, is a proper amount to set aside for the efforts of the Coast Guard vessels and their crews. The balance, or 90% of the award, totaling $36,000.00, is set aside to the BARBARA LEE and

---

1. Gilmore and Black, Law of Admiralty, 464, 465.

her crew. 40% of that amount is awarded to the claimant, Onalue Bolam, administratrix of the Estate of Robert Bolam, deceased, the skipper of the vessel, 20% to Mary Louise Sigurdson, administratrix of the Estate of Ted Arnold Sigurdson, deceased, 20% to Roy Furfiord, owner of the BARBARA LEE, and the remaining 20% would go to the crewman, Harold Pernula, if he had made a claim in the proceeding.

### SPECIAL AWARDS

It has been frequently held that an award for loss or damage to a salving ship, or for personal injuries, may be viewed as an item of recovery in addition to the general award. Gilmore and Biack, The Law of Admiralty, 465, THE KANAWHA, supra.

If I had found for the claimants in the original libel, the evidence would have supported an award to each of the estates of a sum in excess of $60,000.00. I so find in this salvage proceeding. It goes without saying that the Court cannot make an award to the claimants, in this type of a proceeding, of any sum even approaching the actual damage sustained. At best, the awards must be arbitrary. In my opinion, a special award of $2,500.00 each to the Estate of Robert Bolam, to the Estate of Ted Arnold Sigurdson, and to Roy Furfiord, the owner of the BARBARA LEE, would be just and equitable under salvage law. I so find.

Although the petitioner argues that the total award cannot exceed 50% of the value of the salved vessel, I can find no reason or logic in such an argument or in supporting statements by some of the Courts. It is my view, that under unusual circumstances, the total value of the vessel might be awarded to the salvors.

There is no merit in the contention that claimants waived their claims under salvage law nor in the argument that the statute of limitations should bar the claims.

Proctors for claimants may present conforming findings and decree.