ZANZIBAR SHIPPING, S. A.

v.

RAILROAD LOCOMOTIVE ENGINE NUMBER 2199, Railroad Car Number 17860, Railroad Car Number 33641, Sixteen Unknown Railroad Cars and Missouri Pacific Railroad Company.

Civ. A. No. B–80–241.

United States District Court,
S. D. Texas,
Brownsville Division.

Feb. 25, 1982.

Julian & Seele, Robert M. Julian, Houston, Tex., for plaintiff.

Hardy, Rodriguez & Colvin, Eduardo R. Rodriguez, Brownsville, Tex., for defendant.

## MEMORANDUM DECISION

DeANDA, District Judge.

The ship now called "ARCTIC STAR" has seen a colorful and varied career. Christened the "ROYAL SCOTSMAN" in 1936, she plied the rough seas between Belfast and Glasgow and survived. She risked German U-Boats when used as a troop ship in World War II and survived. She even had a name change (to "APOLLO") and saw use as a spy ship for the CIA and survived. After having successfully avoided these oft-encountered and expected nautical dangers, it is perhaps quite ironic that she did not survive the night of September 16, 1980, when while lying at berth in the Port of Brownsville, Texas, she was rammed and constructively sunk by a railroad train.

In addition to its unusual history, the ownership of the "ARCTIC STAR" is also far from ordinary. Although since being rechristened the "ARCTIC STAR" the ship has never left the Port of Brownsville, Texas, it is owned by Zanzibar Shipping, S. A., a Panamanian corporation with its headquarters in Milwaukee, Wisconsin. The exact makeup of this corporation, created especially for ownership of the "ARCTIC STAR," is shrouded in mystery; its stock is "bearer stock" and not even the corporate secretary, Ms. Ann Priddy, has any idea who or where its stockholders are. Despite its being headquartered in Wisconsin and having its only known asset permanently docked in Texas, Zanzibar Shipping maintains that it does no business in the United States.

The ship's master is Captain Robert Manning, all of whose navigational charts seem to point towards the federal courthouse. See *U. S. v. Firebird, Inc.*, No. B–79–116, (S.D.Texas, filed May 17, 1979); *Baldwin v. Cisneros*, No. B–79–249 (S.D.Tex., filed November 15, 1979); *Brownsville Navigational District v. "ARCTIC STAR"*, No. B–82–5 (S.D.Tex., filed January 11, 1982); *Zanzibar Shipping v. United States*, No. H–82–288 (S.D.Tex., filed after January 11, 1982).

The Missouri Pacific Railroad Company has operated a railroad since at least 1885. See *Missouri Pacific Railroad Company v. Humes*, 115 U.S. 512, 6 S.Ct. 110, 29 L.Ed. 463 (1885). In that time its trains have collided with countless wagons, carriages, cars, trucks, and pedestrians. See, e.g., *Missouri Pacific Railroad Company v. Lee*, 7 S.W. 857 (Tex.1888) (wagon); *Missouri Pacific Railroad Company v. Peay*, 20 S.W. 57 (Tex.1892) (carriage); *Gonzales v. Missouri Pacific Railroad Company*, 511 F.2d 629 (5th Cir. 1975) (car); *Missouri Pacific Railroad Company v. South Texas Candy Company*, 65 S.W.2d 325 (Tex.Civ.App.—San Antonio, no writ, 1933) (truck); *Missouri Pacific Railroad Company v. Weisen*, 65 Tex. 443 (Tex.1886) (pedestrian). On September 16, 1980, however, it may have forged new ground in railroad history when one of its crews ran their train into the side of the "ARCTIC STAR." (Neither LEXIS nor the Court's manual research has uncovered any other case of a train striking a ship.) But cf. *Chicago Burlington & Quincy Railroad Company v. W. C. Harms*, 134 F.Supp. 636 (S.D.Tex., 1954) (train struck barge on railroad tracks, barge held liable!)

Not unwisely, the railroad has conceded liability.[1] The remaining issue is the amount of damages. Pursuant to Rule 52(a) Federal Rules of Civil Procedure, the Court enters this memoranda decision as its findings of fact and conclusions of law.

## THE VALUE OF THE SHIP

■ The measure of damages in a collision case is an old one, *restitutio in integrum.* Plaintiff is entitled to that amount of damages which will put him in as good a position pecuniarily as if his property had not been destroyed. *Standard Oil Company v. Southern Pacific Company*, 268 U.S. 146, 155–156, 45 S.Ct. 465, 466–467, 69 L.Ed. 890 (1924); *The Baltimore*, 8 Wall. 377, 19 L.Ed. 463 (1869). Losses are classified in three ways—total, partial, and constructive total. If a loss is total, the measure of damages is the market value, if there is one, of the vessel lost. *The Baltimore, supra.* If a loss is partial, the measure of damages is the reasonable value of repairs plus demurrage occasioned by the time taken to complete the repairs. *The Umbria*, 166 U.S. 404, 421–422, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1896). If a loss is deemed a constructive total loss, damages are the ship's value at the time of collision, less salvage. *Ibid.* A loss is deemed total when the ship is lost. A loss is deemed constructive total when the cost of repairs exceeds the ship's value. Any other loss is partial.

■ The "ARCTIC STAR" was not lost. She lies now, as she lay then, docked at the Port of Brownsville. To determine whether she was a partial or constructive total loss,

1. Upon discovery of their mistake, one of the train's crew was heard to exclaim in referring to their conductor, "Well, I guess she's really gonna catch it this time." (See testimony of Scott Manning, and Plaintiff's Exhibit 389.)

the Court must determine whether the cost of repairs exceeds the value of the ship. After reviewing all of the evidence, the Court concludes that the "ARCTIC STAR" is a constructive total loss.

The Court finds from a preponderance of the evidence that the collision caused great damage to the "ARCTIC STAR" and that that damage extended beyond the point of impact. While some disagreement exists as to the speed of the train, it is undisputed that the impact moved the ship away from the dock. (See testimony of Lauro Castillo and other eyewitnesses.) It is also undisputed that the train in question consisted of one locomotive and 18 loaded freight cars and weighed over 3,750,000 pounds. (See testimony of Calixto Sandoval and Plaintiff's Exhibits 338 and 159.)

Plaintiff's accident reconstruction expert, William B. Ogletree, testified that the impact would push out the stern of the ship and cause it to rotate, bringing the bow in. The bow would then collide with the dock. The ship would also roll because it was hit above the waterline. The combination of rolling and the second collision created tremendous torque stress which was placed on the ship and twisted or "racked" the hull.

Mr. Ogletree's theory is corroborated by extrinsic evidence. Shortly after the collision, the ship began to take on water. (See testimony of Scott Manning.) The nine-inch polypropylene stern lines securing the ship snapped from the impact. (See testimony of Captain Robert Manning.) The ship's bow fender rail was damaged, as was the dock beside the bow. Evidence of misalignment, indicating twistage, was found by Ogletree and by another surveyor, Mr. Nimai Bandhu Ghose. (See Ogletree testimony and Ghose deposition.) The Court finds that this is credible evidence which preponderates over evidence that the collision damage occurred only at the point of impact.

Repair of a twisted hull is extremely expensive. The "ARCTIC STAR" is a riveted-hull vessel, a type of construction no longer used in shipbuilding. To determine the exact extent of the damages would require the ship to be towed to a shipyard capable of doing this type of repair work and there drydocking and completely inspecting the ship. Estimates for this repair work were uniformly high. (See testimony of Manning, Dierlam, Fergus Fleming, and Robert Hesley.) The lowest estimate is $10,000,000.

If the value of the "ARCTIC STAR" is less than $10,000,000, the ship must be deemed a constructive total loss. After reviewing every indicia of value presented to the Court, the Court concludes that the value of the "ARCTIC STAR" is significantly less than $10,000,000.

Ascertaining the value of the "ARCTIC STAR" on September 16, 1980, is not an easy task. As noted earlier, Plaintiff is entitled to be put in as good a position pecuniarily as if the collision had not occurred. The accepted measure of damages is market value at the time of collision. *The Baltimore, supra,* at 387, 19 L.Ed. 463. In cases where there is no market value or where market value cannot be ascertained, other evidence of value can be considered. As pointed out in *Standard Oil, supra,* at 156, 45 S.Ct. at 467, "value is the thing to be found . . . The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant fact." Relevant factors include opinion testimony, reproduction cost less depreciation, condition of repair of the vessel, uses for the vessel, its insured value, and its mortgage value. See *The Monarch of Nassau,* 180 F.2d 962 (5th Cir. 1957).

The Court in ascertaining the value of the "ARCTIC STAR" has determined that a fair market value for her cannot be determined and so it has made its decision by considering all relevant factors presented to it. The only evidence of market value was the evidence of two prior sales of the ship itself. The vessel was purchased in 1977 for a price of $90,000, delivered to Brownsville from Nassau. (See testimony of Richard Jaross.) In April, 1978 she was sold to the current owners at auction for $188,000.

(See testimony of Jaross and of Captain Manning.) Two sales separated by one year and both occurring over two years before the accident occurred are not enough data from which to conclude a fair market value, especially since improvements were made to the vessel after its auction purchase. (See testimony of Captain Manning and of Ann Priddy.) They are, however, highly probative of value and have been given great consideration.

As is often the case, and as courts of admiralty have too often had to take notice, there is a great divergence among the opinion testimony of the experts. See *Petition of the United States*, 229 F.Supp. 241 (D.Or., 1963); *Wilson Line v. United States*, 78 F.Supp. 821 (Ct.Cl., 1948); *Oliver J. Olson Company v. United States*, 71 F.Supp. 355 (Ct.Cl., 1947). As the Court of Claims, on whom fell the problem of placing the value of ships requisitioned by the government in World War II stated in *Oliver J. Olson, supra*, at 356:

> As usual the opinions of the experts differed widely. . . . The circumstances are generally agreed upon. These are factual. But the expert witness lives in a different realm. He is not limited to facts. He may give his opinion. He sometimes deals in hypotheses and postulates. He is sometimes not even hampered by the facts. Somewhere in this shadowland of blended truth, opinion, and imagination the Court must undertake to ascertain the real facts.

In *Oliver J. Olson* the difference between the experts was $325,000 (Plaintiff's expert) against $200,000 (Defendant's expert). Here, where the circumstances but not their consequences are generally agreed upon, the differences are cavernous. One of Defendant's experts, Tommy Laing, estimated the damages at $21,000, based on cost of repair; one of Plaintiff's experts Fergus Fleming, estimated damages at $35,000,000, based on cost of replacement. This is not a shadowland, but the Twilight Zone. Even

when considering value alone, the differences are staggering. A surveyor for Plaintiff, Manning Dierlam, estimated the "ARCTIC STAR"'s market value at $2,500,000. (See Dierlam's testimony, and Plaintiff's Exhibit 251.) Defendant's experts' top value was $350,000. (See testimony of Curley Godeux.)

Plaintiff urges this Court to adopt reproduction cost less depreciation as the best determinant of the value of the "ARCTIC STAR." Plaintiff urges the Court to abandon market value as the test of value because it views the ship as being "unique." The "ARCTIC STAR" is old and has certain useful and uncommon features such as a screw (propellor) at each end, but it is not unique. In the only case cited by Plaintiff which actually finds a ship to be unique, *Petition of the United States, supra*, the vessel found to be unique was a Coast Guard lifeboat and rescue vessel which had been specially designed and built just for that purpose.

The "ARCTIC STAR" is and was built as a general passenger and freight hauler. That it was undergoing modifications for use as a salvage vessel neither makes it at the time of collision a specialized vessel nor makes it unique. There is conflicting testimony about her adaptability and utility as a salvage vessel. (Compare testimony of Captain Manning, Fleming and Dierlam, with that of Billy Algoe and Harry Reineke.)[2] The Court finds that the ship's value as a salvage vessel was far too speculative to merit special consideration.

The Court also finds that replacement cost less depreciation is not a useful tool in placing a value upon the "ARCTIC STAR" because the results obtained thereby do not conform with common sense. The "ARCTIC STAR" was built for another era and another economy. Ships of her type, both in service and construction, are simply no longer built. No reasonable person would spend the amount required to

---

2. Reineke also testified that a newly built fully equipped salvage vessel can be purchased for $7,000,000.

rebuild her. It makes no sense to depreciate such a figure to ascertain her value. Cf. *The John Cadawalader,* 139 F.Supp. 742 (Ct.Cl., 1956); *Gartland Company v. United States,* 98 F.Supp. 587, (Ct.Cl., 1951); *Smith-Douglass Co. v. United States,* 81 F.Supp. 215 (Ct.Cl., 1948).

A valuable tool in determining the value of a ship is its condition at the time of loss. The "ARCTIC STAR" sailed into Brownsville under her own power in 1977, but at the time of collision, she had not been to sea since. (See testimony of Jaross, Dierlam, and Captain Manning.) She had not been maintained in class since 1968. (See Dierlam testimony and Plaintiff's Exhibit 374.) She was not maintained while owned by Mr. Jaross. (See Jaross testimony.) At the time of collision she could not meet the SOLAS (Safety of Life at Sea) standards. (See Dierlam testimony.) The electrician's log kept by Scott Manning, (Plaintiff's Exhibit 389) reveals that the ship's electrical system was in a state of disrepair. William Orange, a marine surveyor employed by Defendant, described the ship's maintenance as "deplorable." Finally, the photographic evidence introduced during the trial indicates an aging and rusting ship in poor condition. The Court finds all of the above to be facts and must conclude that on September 16, 1980, the "ARCTIC STAR" was in poor condition.

The evidence further reveals that the ship could not have put to sea in September, 1980, because it lacked the proper papers. The "ARCTIC STAR" is a Panamanian-registered vessel. As such it must have a "Patente" or license from Panama before it can sail. The evidence indicates that the "ARCTIC STAR" had a provisional "Patente" which had expired in August, 1980 and was not renewed. (See testimony of Juan Porras and Defendant's Exhibits 11a–f.) Furthermore, to maintain its "Patente" the "ARCTIC STAR" would have been required by Panamanian law to undergo a special inspection for ships over 20 years of age. (See testimony of Richard Deely.) The fact that the "ARCTIC STAR" could not legally sail on September 16, 1980, and the costs of re-securing her seaworthy status are important and relevant factors the Court has considered in determining her value. Because of her poor condition and lack of papers the Court further finds that on September 16, 1980, the "ARCTIC STAR" was not seaworthy.

Two other factors the Court has utilized in determining the value of the "ARCTIC STAR" are her insured value and the ship's mortgage. Plaintiff's claims of great value for its vessel are undercut by the fact that it did not maintain insurance on her. (See testimony of Captain Manning.) Zanzibar Shipping apparently negotiated a mortgage with a foreign bank for $200,000 and had received a Letter of Credit for that amount. (See testimony of Captain Manning.)

Plaintiff also claims to have made improvements to the vessel. It claims to have made a $1,400,000 investment in the ship, including the purchase price. From the evidence presented at trial, much of this investment is in equipment and tools for salvage operations. None of this was damaged or lost in the collision and should be fully salvageable. No evidence was presented as to the value of any new fixtures, immovable additions, or permanent improvements having been made to the ship itself. There is testimony that the ship was painted, but no evidence of what effect that painting had on the ship's value. Because of the paucity of evidence presented to it, the Court cannot even begin to place any dollar value on the improvements made.

After considering all of the above factors and findings of fact, the Court concludes that the value of the "ARCTIC STAR" on September 16, 1980 was $350,000. The Court finds her salvage value was $58,400, based on $40 a ton for uncut scrap and a weight of 1460 tons. (See testimony of Captain Manning.) Plaintiff is therefore entitled to recover from Defendant the sum of $291,600 as damages for the constructive total loss of the "ARCTIC STAR."

## CONSEQUENTIAL DAMAGES

On its way to striking the "ARCTIC STAR" the Missouri Pacific train also ran

over and destroyed a scow work boat and a hatch cover belonging to Plaintiff. Both were destroyed. Plaintiff places their values at $6,000 and $7,000 respectively. Defendant has not contested either valuation; accordingly, both are allowed.

■ The impact of the collision snapped two nine-inch mooring lines. Plaintiff contends their value was $4,000. (See Pre-trial Order.) No evidence was offered at trial concerning their value. Therefore, no award can be given.

■ Plaintiff also contends that 10 tons of oil were contaminated by water leakage after the collision and values the fuel at $2,728 (See testimony of Ann Priddy). The Court finds this to be an awardable expense.

■ Plaintiff's claim for survey costs is also an allowable expense, but only for surveys which estimated the damages or repair costs. Work done by the surveyors in planning or designing repair work is not an allowable expense. Because of the dispute over the extent of collision-caused damages, several surveys were taken. Since the Court finds that the hull damage was as extensive as Plaintiff contends, Plaintiff's claims for all these surveys shall be allowed. The surveyor fees of Emmet Dierlam, $3,000, and Nimai Bandhu Ghose, $5,007.44 are therefore allowed. The work of surveyor Fleming, however, includes work done in planning repairs and as an expert witness for this litigation. This time is not allowable and Mr. Fleming's survey expenses are reduced to $2,240.

■ Plaintiff's claim for wharfage cannot be allowed. Although Plaintiff claims the ship was set to sail on November 1, 1980, the Court has found the ship was not seaworthy at the time of collision. The Court also finds that the ship would not have been ready to sail on November 1, 1980, because her papers were not in order. Therefore, she would have remained wharfed in Brownsville and the wharfage expenses would have been incurred by Plaintiff regardless of the collision. Further, the Court finds that Plaintiff's action

in keeping the vessel moored at the Port of Brownsville where, by its own admissions, no repairs could be effected upon her was willful and unreasonable and constitutes a failure to mitigate damages.

The Court finds that the proper and prevailing rate of interest is 12% per annum from date of loss. Plaintiff shall recover this as pre-judgment interest from Defendant.

All other claims not specifically granted in this Order are hereby DENIED.

An appropriate Final Judgment shall accompany this Memorandum Decision.

The Clerk shall send a copy of this Memorandum Decision to counsel for the parties.