### THE SILVANUS.

**Petition of NEDERLANDSCHE INDISCHE TANKSTOOMBOOT MAATS.**

### THE THOMÁS H. WHEELER.

**Petition of STANDARD OIL CO. (N. J.).**

**Nos. 18455, 18685.**

District Court, E. D. Louisiana.

Jan. 6, 1932.

Denegre, Leovy & Chaffe (by Henry H. Chaffe), of New Orleans, La., for the Silvanus.

Kirlin, Campbell, Hickox, Keating & Mc-Grann (by W. H. McGrann), of New York City, and Charles A. O'Niell, Jr., of New Orleans, La., for Standard Oil Co. and the Wheeler.

BORAH, District Judge.

Both liability and the right to limit are questioned in the cases at bar.

These cases arise out of a collision that occurred in the Mississippi river about forty miles below New Orleans, on the evening of the 8th of April, 1926, between two tankers, the Silvanus bound down the river for sea, and the Thomas H. Wheeler, bound up the river from Texas City to Baton Rouge. The Silvanus, loaded to her summer marks, was carrying a cargo of Venezuelian naphtha and casinghead gasoline, and the Wheeler had a cargo of Reagan crude oil. Both vessels were in charge of a licensed pilot and were in fog in the vicinity of Favret Light when the stem of the Wheeler came into collision with the port side of the Silvanus at her No. 9 tank. The impact caused an explosion on the Silvanus, ignited her highly volatile cargo, and set both vessels afire. The fire on the Silvanus spread with great rapidity and she was abandoned by her officers and crew, twenty-six of whom perished, exclusive of her pilot, who was also lost. The Silvanus, with her engines still in forward motion, continued down the port side of the Wheeler, struck the east bank, and finally came up on the west bank, where she was subsequently salvaged with part of her cargo. The fire on the Wheeler

was extinguished by her crew and she came to anchor near Favret Light on the east bank, where she remained until the next day when she proceeded up the river.

For the Silvanus it is urged that she was proceeding downstream about in the middle of the river where there was either no fog or haze, or it was so light as not to affect visibility; that at the same time the Wheeler was ascending the river on a parallel but opposite course closer toward the east bank, the two courses being sufficiently far apart, had each vessel maintained her course, for the two vessels to have passed each other port to port in perfect safety; that the Silvanus, up to the collision, held her same course, which was the proper course for vessels descending the river, but while the two vessels were in the above situation the Wheeler disappeared into the fog bank up against the east bank, and after the two vessels had exchanged signals indicating an agreement to pass port to port the Wheeler changed her course and suddenly appeared out of the fog headed for the Silvanus and collided with the Silvanus on the latter's port side at an angle of about seventy degrees; and that between the time that the Wheeler came out of the fog and the moment of the collision there elapsed such a short time that it was impossible for the Silvanus to do anything to avoid the collision. It is further claimed that the collision occurred while the two vessels were about in the middle of the river and about a quarter of a mile above Favret Light.

The Wheeler's version is that she was pursuing a course close to her starboard bank; that although the Topa Topa was seen and passed on her port hand several minutes before the collision, it was foggy ahead and the Wheeler had already reduced speed and was sounding fog signals because of the fog; that the Silvanus had not been sighted; that it was decided to anchor above Favret Light and the engines and helm were operating with that end in view; that while so maneuvering a whistle was heard ahead, and immediately afterwards the Silvanus broke through the fog almost ahead, but apparently swinging on a port helm and moving bodily down on the Wheeler which was substantially if not wholly stopped; and that the contact occurred at a small angle between the stem of the Wheeler and the port forward side of the Silvanus at a point in the river near the east bank of the river and a little above Favret Light.

From the versions of the two vessels it is apparent that the issues largely involve disputed questions of fact. There is, however, a marked distinction between the two theories of liability, in that the Wheeler has not been charged with any violations of fog navigation, while the Wheeler charges the Silvanus with specific violations with respect thereto. Now one of the issues involves the question of fact as to where the collision occurred with respect to the middle of the river, and that of course is important, as a determination thereof will facilitate a solution of the problem in hand.

The testimony with respect thereto shows that on the evening of the day in question the Wheeler was proceeding up the river at full speed, but owing to a three-mile current she was making only about eight knots by the land. Upon arriving at West Point a la Hache, which was more than three miles below Favret Light, she crossed over the river from the west bank and proceeded on a course upstream along the east bank heading up for Favret Light. The Wheeler continued on this course close to the east bank, which was the proper course for an ascending vessel to follow in this comparatively straight stretch of the river, and while so proceeding in the lower vicinity of Favret Light encountered fog. Whereupon at 8:21 her speed was reduced to half speed, and fog signals on her whistle were started and maintained up to the collision, which occurred at 8:28, according to the clock in the engine room which was two minutes faster than the deck clock. Other entries in the bell book, the pertinence of which will be averred to later, show that the Wheeler's engines had been stopped at 8:25, then put slow ahead at 8:25, and again stopped at 8:26; full astern at 8:27 and stopped at 8:29.

Reverting again to the course of the Wheeler and her movements subsequent to the reduction of speed, the testimony shows that while proceeding up the river near the east bank she exchanged passing signals with the Topa Topa, which was likewise blowing fog signals, and passed said vessel on her port hand about one thousand feet below Favret Light. That thereafter Pilot Caulfield and Captain MacKenzie of the Wheeler, mindful of the danger incident to proceeding ahead in weather that bore every indication of becoming thick, decided to come to anchor a little above Favret Light where there was a safe anchorage. Caulfield and others had frequently anchored ships there; in fact, it was the only proper place in that immediate vicinity that was available to the Wheeler because the water was too deep on the west bank

and below Favret Light. Having determined to anchor, an intention which is clearly evidenced by the contemporaneous entries in the engine bell book hereinabove referred to, the pilot gave the order "stop" to kill the headway on the Wheeler and ordered the wheelsman to "port a little more," and on learning from the latter that she was not steering he then ordered the engines slow ahead, and when she came up in shape he gave the second order "stop." While thus proceeding with caution on her proper and lawful side of the river seeking a well-known anchorage, the Wheeler suddenly became confronted by the Silvanus swinging down on her at the rate of not less than ten miles per hour, and although the Wheeler's engines had been stopped from a moderate speed and were immediately reversed, collision resulted because of the failure of the Silvanus to seasonably check her headway by stopping and reversing her engines. The Wheeler did all that could reasonably have been done to prevent collision. The fact that she did not see the Silvanus earlier or hear fog signals from her, if sounded, should not be held a fault. Indeed, it is extremely doubtful if any fog signals, save one, were blown. Captain Visser, the only surviving member of the Silvanus who was in a position to know anything about the navigation of his vessel, testified variously on the subject. On one occasion he stated that the Silvanus did not sound any fog signals before the collision or within ten or fifteen minutes prior thereto. At another point in his testimony he designates as a fog signal the signal that was sounded immediately before the collision. In any event it is quite clear that those on the Wheeler did not hear any signals from the Silvanus until the one long blast signal was heard as the range lights of the Silvanus broke through the fog when they knew of her presence for the first time. This signal was followed by four blasts after the Wheeler had answered with one long blast, whereupon the Wheeler immediately blew three blasts, indicating that her engines were going full speed astern.

It is urged on behalf of the Silvanus that this one long blast was a passing signal and that the Wheeler by answering with one long blast assented to a port to port passing, but that contrary to said agreement and in violation thereof the Wheeler changed her course and suddenly appeared out of the fog headed for the Silvanus at an angle of seventy degrees and in such close proximity thereto that it was impossible for the Silvanus to avoid the collision. Assuming that the facts with reference to the exchange of passing signals are as stated, this argument in my judgment is untenable, as it is based on the false assumption that the Silvanus as the descending vessel had the right to initiate passing signals under Pilot Rule I, whereas her plain duty under the circumstances was to blow the danger signal, stop, and reverse her engines until such time as passing signals could be agreed upon. The Silvanus not only failed to invoke Pilot Rule I, but she violated it in these particulars. There is likewise no merit in the claim that the Wheeler changed her course. This contention is based on inference and is not supported by the evidence. It is not only counter to the positive testimony of the witnesses who performed the acts preparatory to anchoring and who directed and executed the helm movements of the Wheeler, but it is refuted by the testimony which shows that the physical damages sustained by the vessels were such that they could not have come together at a broad angle but that the Silvanus in fact was moving across the bow of the Wheeler and that the Wheeler was nearly if not wholly at a standstill.

The course of the Wheeler up to the point of collision having been considered in its essentials, further consideration will now be given to the testimony which further refutes the contention of the Silvanus that she was proceeding downstream in about the middle of the river. Zatarain and Bogan, pilot, and third officer respectively of the steamship Topa Topa, were undoubtedly in the best position to observe the movements of the Silvanus, as their vessel was descending the river at the rate of fourteen or fourteen and one-half miles per hour over the land, which was a mile or a mile and a quarter faster than the speed per hour of the Silvanus and had overtaken her about a half hour before the collision happened. According to their testimony, the Silvanus was then on her starboard side of the river, in which relative position she was observed to remain until they looked back about five or ten minutes before the collision and saw her headed for Favret Light. They again looked back when they heard the crash, and on this occasion observed the Silvanus on their port quarter, a little above Favret Light according to Zatarain, and nearer to the eastward bank. Their estimate of the situation, in my opinion, is entitled to the greatest weight considering their familiarity with the river and the fact that the Topa Topa was then approximately in the middle of the river and less than a mile

distant. Their testimony not only corroborates the story as told by the Wheeler's witnesses, but it is likewise consistent with the objective movements of the Silvanus, as the probabilities all favor that she was using Favret Light as a bearing light to straighten herself down the river and that in seeking a departure therefrom she had proceeded to the eastward side of midriver.

Another circumstance that strongly indicates that the collision occurred nearer the east bank is the fact that every surviving member of the crew of the Silvanus who took to the water and swam ashore swam to the east bank.

■ Considering the testimony as a whole in the light of all the surrounding facts and circumstances of the case, I am persuaded that the collision occurred near the east bank of the river, certainly east of the middle of the river, and in the vicinity of Favret Light on which side the Wheeler was proceeding upstream, and that the Silvanus was at fault in not keeping clear of that side and of the Wheeler.

■ The only other issue of fact herein involves the question as to whether or not the weather conditions prevailing were such as to bring into operation the rules and the laws applicable governing the navigation of vessels in a fog. This question in a measure has already been considered in discussing the previous issue; however, to the extent not covered further additional observations would appear in order. It is, as previously stated, the theory of the Silvanus that the fog rules did not apply and in consequence the Wheeler has not been charged with any violations with respect thereto. Conceding the condition of the fog to be as claimed by the Silvanus, she should have slowed down as Captain Visser admits having observed the fog bank ahead. But she failed to take this precaution and continued at full speed at the rate of thirteen miles an hour or more until two minutes before the collision when there was an order of "slow" and "stop," followed immediately by "full speed ahead," although at that time the Silvanus knew that the Wheeler was close at hand and also in fog. Indeed, the rule requiring vessels to go at a moderate speed in a fog would be of little avail to vessels within a fog bank if other vessels navigating in the clear or closely upon the edge of a fog bank should be allowed to proceed at immoderate speed on approaching or entering into the same. Whatever merit there may be in the contention of the Silvanus, there can be no doubt that a fog existed at least to such an extent as to interfere with safe navigation. In the petition of the Silvanus it was admitted that it was misty with occasional fog banks. Captain Visser also admitted that because of the fog he was called to the bridge on two occasions by the officer on watch, and that it was foggy at 8:19, six minutes before the collision when the order "stand by" was given. The testimony is also in agreement that when the vessels sighted each other immediately before collision, they were in a dense fog with visibility of less than five hundred feet. The situation was clearly such as to make mandatory the observance of the rules and laws with respect to fog navigation. Had the Silvanus sounded fog signals and proceeded at a moderate speed as required under both the Pilot Rules and the Statutory Rules for Rivers whose Waters Flow into the Gulf of Mexico and its Tributaries, there can be slight doubt but that the collision would have been averted. Her failure of duty in this respect, disregarding all other circumstances, is sufficient to account for the collision.

■ Where, as here, the fault of one vessel is clearly established, the evidence of the other vessel's fault must also be clear and convincing in order to make out a case for apportionment of damage. The City of New York, 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84; The Ludvig Holberg, 157 U. S. 60, 15 S. Ct. 477, 39 L. Ed. 620; The Umbria, 166 U. S. 404, 17 S. Ct. 610, 41 L. Ed. 1053. The Silvanus has not sustained that burden.

■ I am of the opinion that the Wheeler was at a place in the river where custom and usage dictated that she had a right to be, and that she was not at fault in respect of her navigation in approaching the place of collision and during the times immediately preceding the collision. My conclusion is that the Silvanus was wholly to blame and that the Wheeler was free from fault.

■ The remaining question for solution is whether or not the petitioner Nederlandsche Indische Tankstoomboot Maats is entitled, under 46 USCA § 183, to limit its liability. The findings heretofore reached preclude the necessity for further rehearsing the evidence on this branch of the case, for it is clear that the loss, damage, injury, and destruction resulting from the collision were not caused or contributed to by any negligence or fault on the part of the petitioner, but were occasioned and incurred without its privity or knowledge.

A decree may accordingly be entered in proceeding No. 18455, granting unto the pe-

titioner, Nederlandsche Indische Tankstoomboot Maats, the right to limit its liability as prayed for.

A decree may likewise be entered in proceeding No. 18685, exempting the petitioner, Standard Oil Company (N. J.), from liability and continuing in full force and effect the injunction which heretofore issued as prayed for in the petition.

If it is not believed that this opinion is a sufficient compliance with rule 46½ of the Admiralty Rules (28 USCA § 723), findings of fact and conclusions of law may be submitted; otherwise, this opinion will stand as the findings of fact and conclusions of law in these cases and be deemed to constitute the formal decision thereof.