VALLEY TOWING SERVICE, INC., etc., et al., Plaintiffs-Appellants, Cross-Appellees,

v.

S/S AMERICAN WHEAT, FREIGHTERS, INC., Claimant, et al., Defendants-Appellees, Cross-Appellants,

Upper Mississippi Towing Corporation et al., Defendants-Appellees.

TENNECO OIL COMPANY, Plaintiff-Appellant, Cross-Appellee,

v.

S/S AMERICAN WHEAT, FREIGHTERS, INC., Claimant, et al., Defendants-Appellees, Cross-Appellants.

No. 78–2355.

United States Court of Appeals, Fifth Circuit.

June 4, 1980.

Robert M. Contois, Jr., New Orleans, La., for Valley Towing Service, Inc., etc., et al.

George A. Frilot, III, Douglas P. Matthews, New Orleans, La., for Tenneco Oil Co.

George W. Healy, III, John W. Sims, New Orleans, La., for S/S American Wheat, Freighters, Inc.

Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, J. Y. Gilmore, Jr., New Orleans, La., for Upper Miss. Towing Co.

Before JONES, GEE and REAVLEY, Circuit Judges.

REAVLEY, Circuit Judge:

This appeal is spawned by a collision on the Mississippi River on January 29, 1975. Ultimately, eleven lawsuits were filed as a result of the impact between the S/S AMERICAN WHEAT ("AMERICAN WHEAT") and the M/V MAMA LERE ("MAMA LERE") and the tow she was pushing. The actions were consolidated and after bench trial on the issues of liability, the district court concluded that the accident occurred as a result of 70 percent fault on the part of the MAMA LERE and 30 percent fault on the part of the AMERICAN WHEAT. The issues before us are threefold. First, whether the lower court erred in deciding that an Inland Rule of Navigation, pertaining to sounding fog signals, did not apply to the AMERICAN WHEAT because she was operating on the periphery of a fog bank rather than within the fog. Second, whether the trial court muffed the apportionment of fault by failing to supplement the blame of the AMERICAN WHEAT for failure to observe the point-bend custom.[1] Finally, assuming that the trial court's resolution of the foregoing issues was correct, was the allocation of fault clearly erroneous? We remand with instructions to make additional findings in resolving the first two issues.

The AMERICAN WHEAT, a 635-foot freighter, was downbound on the Mississippi River below New Orleans destined for the Gulf of Mexico in the late afternoon. The MAMA LERE, a typical river push boat, was traveling upriver pushing three barges aligned single file ahead of the tug. Both vessels were favoring the west side of the river. The trial court found that fog, obscuring vision, prevailed along the west

---

1. The point-bend custom is a judicially recognized custom for navigating the Mississippi River below New Orleans. It provides that upbound vessels come up under the points in the slackwater and downbound vessels run the bends. The effect of the rule in some instances, such as this one, is to require vessels to cross the river diagonally from point to point, or from bend to bend. The obvious navigational hazard requires all those piloting on the river to be well versed in the custom. *Koch-Ellis Marine Contractors, Inc. v. S/S Capetan Dimitris*, 176 F.Supp. 645, 646 (E.D.La.1959), aff'd sub nom. *Vlastos v. Koch-Ellis Marine Contractors, Inc.*, 302 F.2d 462 (5th Cir. 1962); *The Norne*, 59 F.2d 145, 147 (5th Cir. 1932).

bank in the vicinity of the collision and that it was dense primarily at the surface of the water; nevertheless, neither vessel sounded fog signals.

Preceding events set the stage for the collision. The ILLUSTRIOUS COLOCO-TRONIS ("ILLUSTRIOUS"), an upbound bulk carrier, overtook and passed the MAMA LERE below Nine Mile Point, which is located at about mile 86 on the river. Sometime after rounding the point, the ILLUSTRIOUS passed starboard to starboard with the downbound GIRLIE KNIGHT. The trial court found that this placed the ILLUSTRIOUS further towards the west bank than she would have preferred because her destination was a short distance up river on the east bank. Shortly thereafter, in the vicinage of mile marker 88, the ILLUSTRIOUS effected a port to port passing with the AMERICAN WHEAT. This, in turn, the trial court found, forced the AMERICAN WHEAT nearer to the west bank than would have been ideal since the vessel was required to turn towards the east bank in preparation for observing the point-bend custom roughly two miles below at Nine Mile Point. Despite the fact that the captain of the ILLUSTRIOUS advised the AMERICAN WHEAT that the MAMA LERE was upbound close astern, no confirmed passing agreement was formulated between the latter two vessels. After clearing the ILLUSTRIOUS, the AMERICAN WHEAT veered towards the east bank in an effort to shape up for the bend at Nine Mile Point. Prior to this maneuver, the AMERICAN WHEAT was skirting along the periphery of the fog bank which persisted to her starboard side. Suddenly, the lead barge in the convoy being propelled by the MAMA LERE emerged from the fog between 150 and 200 feet ahead of the AMERICAN

WHEAT. At that point collision was inevitable.

For her part, the MAMA LERE was also aware of the presence of the AMERICAN WHEAT. In fact, personnel aboard the MAMA LERE sighted the range lights aboard the AMERICAN WHEAT while the vessels were still about half a mile apart and they continued observing the AMERICAN WHEAT for two to three minutes prior to the accident. Nevertheless, the MAMA LERE adhered to her course and she did not abate her speed, a steady seven knots per hour, even during periods when she was obscured by fog, until seconds before the collision. Instants before impact a voice was heard over the radio aboard the MAMA LERE ordering the vessel to be brought hard to starboard. Apparently, this was a command given aboard the AMERICAN WHEAT in an attempt to avert disaster, but it was heard by those in the wheelhouse on the MAMA LERE who interpreted it as an order to bring the tug and its tow hard to starboard. Their obedience brought the flotilla across the bow of the AMERICAN WHEAT which struck the middle barge on its port side and rode over the barge into the face of the tug.

*Application of the Inland Rules of Navigation to the AMERICAN WHEAT*

The trial court found that neither colliding vessel sounded fog signals prior to impact. However, it concluded that this fact did not constitute culpable behavior on the part of the AMERICAN WHEAT. The trial judge cited *Union Oil Company of California v. The San Jacinto*, 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972), for the proposition that the rules requiring sounding of fog signals [2] and observance of the half distance rule [3] did not apply to the

2. Article 15 of the Inland Rules of Navigation, 33 U.S.C. § 191 (1976), requires "steam vessels" when towing *in* fog to sound three blasts in succession at intervals of not more than one minute. 33 U.S.C. § 155 (1976) defines "steam vessel" to include any vessel propelled by machinery.

3. The half distance rule is a well-recognized judicial gloss on Article 16 of the Inland Rules of Navigation, 33 U.S.C. § 192 (1976), requiring that vessels *in* fog go "at *a moderate speed,* having careful regard to the existing circumstances and conditions" (emphasis supplied). The gloss "is that, in a fog, 'a moderate speed' is that 'rate of speed as would enable [the vessel] to come to a standstill, by reversing her

AMERICAN WHEAT because she was proceeding near a fog bank and not in the fog. The sole issue confronting us at this juncture is whether the lower court erred in deducing that, because the AMERICAN WHEAT was proceeding adjacent to the fog bank rather than in the fog, she was not required to sound fog signals.[4]

The San Jacinto does not stand for the proposition that a vessel navigating tangentially to a fog bank is not required to sound fog signals. Rather, that case holds that a ship proceeding along a fog bank on an inland river, which has no reason to anticipate that another craft will emerge from the fog on an intersecting course, cannot be held to have contravened the half distance rule when it collides with another vessel that suddenly materializes out of the fog. In contrast to the facts in The San Jacinto, the district court below expressly found that the AMERICAN WHEAT had been notified of the propinquity of the MAMA LERE and the court also found that it would have been normal for the MAMA LERE to be turning towards the east bank at the time of the collision. This latter finding indicates that the AMERICAN WHEAT should have anticipated the possibility that a craft would be turning towards the oil facilities on the eastern bank prior to the casualty.

In fact, The San Jacinto majority expressly disclaimed implying that simply because a ship is running near fog rather than in fog it has no obligation to proceed at "a moderate speed" under the Inland Rules of Navigation. Id. at 145, 93 S.Ct. at 371. It is significant that the majority cited, with apparent approval, The Silver Palm, 94 F.2d 754 (9th Cir.), cert. denied sub nom. United States v. Silver Line Ltd., 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1539 (1938). In that case the Ninth Circuit held that a ship traveling next to a fog bank on a busy coastal shipping lanes was required to obey the moderate speed rule. See also The Silvanus, 56 F.2d 257, 260 (E.D.La.1932) (dictum), aff'd sub nom. The Thomas H. Wheeler, 66 F.2d 113 (5th Cir. 1933) (statutory and pilot rules requiring observation of moderate speed apply to vessels approaching a fog bank or proceeding at its edge). The construction of the applicability of the moderate speed rule in these cases is important because the statutory limitation to "a moderate speed," 33 U.S.C. § 192 (1976), Article 16 of the Inland Rules, is related to the statutory mandate necessitating the sounding of fog signals, 33 U.S.C. § 191 (1976), Article 15 of the Inland Rules. Both were enacted as part of the same statutory scheme and both statutes are facially limited to vessels "in fog."

We do not think that Congress intended that a ship may navigate at the perimeter of fog without obligation to sound fog signals under conditions where it can reasonably be expected that another vessel might cross its path. Our holding is that the statute is transgressed by failure to signal in such a situation, because a contrary result would substantially dilute the congressional purpose for enacting such a rule, viz, the avoidance of maritime collisions, 33 U.S.C. § 154 (1976). The Papoose, 85 F.2d 54, 55 (2d Cir.), cert. denied, 299 U.S. 603, 57 S.Ct. 230, 81 L.Ed. 445 (1936); cf. The Edward E. Loomis, 86 F.2d 705, 708 (2d Cir. 1936) (rule requiring sounding fog signals applies to vessels skirting or approaching a patch of haze).

engines at full speed, before she should collide with a vessel which she should see through the fog.'" Union Oil Company of California v. The San Jacinto, 409 U.S. 140, 144, 93 S.Ct. 368, 371, 34 L.Ed.2d 365 (1972) (citations omitted).

4. The joint brief of Valley Towing Service, Inc. ("Valley Towing"), owner and operator of the MAMA LERE, and those parties whose interests are identical to those of Valley Towing, insists that the trial court also erred in determining that the half distance rule did not apply on these facts to the AMERICAN WHEAT. At oral argument, however, their attorney conceded that they were not seeking a reapportionment of fault based upon the half distance rule because the statutory dereliction the trial court attributed to the AMERICAN WHEAT was failure to observe a moderate speed under conditions of reduced visibility in violation of Articles 16 and 23, 33 U.S.C. §§ 192, 208 (1976). Consequently, the grievance has been abandoned.

■ That the AMERICAN WHEAT was responsible for an incremental portion of the fault causing the mishap is not an inescapable conclusion from the foregoing interpretation of the statute. The failure to sound fog signals is not enough; the nonfeasance must have contributed to the cause of the collision. *Arthur-Smith Corp. v. Gulf States Marine & Mining Co.*, 258 F.2d 449, 452 (5th Cir. 1958). The transcript of the proceedings below intimates that the wheelhouse of the MAMA LERE was so clamorous that fog signals would not have been heard even had they been sounded.[5] A readjustment of fault, contributing to the harm, is required on remand only if the district court finds by a preponderance of the evidence that fog signals from the AMERICAN WHEAT would have been heard by those in the wheelhouse of the MAMA LERE, that the signals would have accentuated their awareness of the impending collision, and that the signals would have moved them to avert disaster.

### The Point-Bend Custom

■ The failure of the trial court to assign fault to the AMERICAN WHEAT for conduct departing from the point-bend custom is also here assailed. We are uncertain whether the lower court found and held (1) that the AMERICAN WHEAT was not in violation of the custom or (2) that the vessel was not liable for any deviation from the rule because it was forced to breach the rule by circumstances beyond its control.[6] If the latter interpretation is correct, the conclusion that the AMERICAN WHEAT was "forced" out of position is clearly erroneous. In a colloquy with the trial judge, the captain of the AMERICAN WHEAT confessed that he acquiesced to a port to port passing with the ILLUSTRIOUS and that he could have insisted on a starboard to starboard passing.[7] A finding that the starboard passing with the ILLUSTRIOUS COLOCOTRONIS, caused her to be closer to the west bank than she would *normally* have been, which in turn necessitated a port to port passing with the AMERICAN WHEAT, and causing her to be closer to the west bank than *normal*. (emphasis supplied).

From this, the trial court concluded:

> Likewise, the AMERICAN WHEAT was not in violation of such custom and cannot be considered as guilty of fault with respect to same. Although the AMERICAN WHEAT was not in the *best* position to begin her crossing  .  .  ., she was forced into her position  .  .  . because of a port to port passing with the ILLUSTRIOUS COLOCOTRONIS. (emphasis supplied).

This finding and conclusion can be read to support either interpretation. There was testimony below to the effect that the AMERICAN WHEAT was out of position in regard to the point-bend custom at the point of collision because she should have been closer to the east bank in anticipation of the bend at Nine Mile Point. However, the testimony of James Winston, Jr., captain of the ILLUSTRIOUS, indicated that there is considerable flexibility as to where a vessel should be in shaping up for the bend and that one of the factors to be considered is the flow of upbound craft. Transcript of Winston Testimony at 26–31. *See also* Valley Towing Exh. 22.

---

5. At page 40 of the transcript below, the captain of the MAMA LERE, who was piloting her at the time of the collision, testified that the wheelhouse of the tug was completely enclosed and was very noisy. He also testified that all navigational equipment was controlled from the wheelhouse. Transcript at 132–33. The deficiency must have been apparent to the MAMA LERE because the captain admitted that she possessed a device for detecting sounds that otherwise would not be heard in the rackety nerve center, but that the device was not activated in the relevant period before the collision. *Id.* at 66. Neither the captain nor Howard Pitt, who was also in the wheelhouse at the time of the tragedy, heard any signals prior to the collision. *Id.* at 66, 197. But the lower court found that the AMERICAN WHEAT sounded a danger signal immediately prior to impact and the evidence supports this finding. This suggests that fog signals from the AMERICAN WHEAT would not have been heard in the wheelhouse of the MAMA LERE. The inference is not compelled, however, because Pitt also testified that the wheelhouse was not so obstreperous as to prevent hearing signals if they had been blown. *Id.* at 197.

6. The fifth finding of fact states:

> 5. The downward bound AMERICAN WHEAT was according to the point/bend custom on a proper course until passing the ILLUSTRIOUS COLOCOTRONIS. This port to port passing caused the AMERICAN WHEAT to be closer to the west bank than was the *usual* custom. In all probability the GIRLIE KNIGHT, by causing a starboard to

7. THE COURT:

> Well, you knew there was fog because something came out of the fog that you

AMERICAN WHEAT was "forced" out of position is strained on these facts since she had the option of being further eastward when she passed the ILLUSTRIOUS.

An adjustment of relative fault between the protagonists to this tragedy is required on remand only if our second construction of the trial court's finding and conclusion is correct and if the trial court finds that any deviation from observance of the point-bend custom was a contributing factor in the collision.

### The Original Division of Fault

Even if no reapportionment of fault is necessitated by a reexamination of the two preceding issues, both sides to this appeal urge that the attribution of culpability, 70 percent–30 percent, is clearly erroneous. The opposing parties naturally assume differing postures; each argues that more fault should have been ascribed to their adversaries.

▉ It is now well-established that liability for property damages resulting from a maritime collision is apportioned on the basis of comparative fault in admiralty. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975); *S. C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 165 (5th Cir. 1979). Questions of negligence and proximate cause are treated as factual issues which cannot be disturbed on appeal unless the resolutions are clearly erroneous. *Marcona Corp. v. OIL SCREW SHIFTY III*, 615 F.2d 206, 208 (5th Cir. 1980); *S. C. Loveland, Inc.*, 608 F.2d at 166. Similarly, the trial court's estimate of the degree of

negligence of each vessel contributing to the injuries belongs to the fact finding genre permitting only clearly erroneous review. *Gele v. Wilson*, 616 F.2d 146, 147 (5th Cir. 1980).

Assuming that no alteration of responsibility emanates from a reappraisal of the aforementioned issues, our review of the record and the district judge's conclusions, regarding the sundry conduct of each vessel constituting fault promoting the collision, affords us no basis for differing with his partition of blame.

In conclusion, we remand for the limited purpose of allowing the lower court to resolve the issues of the sounding of fog signals and the observance of the point-bend custom. The district court is free to make its findings based upon the original record since it did not prevent the introduction of any testimony the parties wished to present on the pertinent issues. *Jefferies v. Harris County Community Action Association*, 615 F.2d 1025, 1032 (5th Cir. 1980). When the findings are made, if consonant with this opinion, the district court may reapportion fault.

REMANDED.

---

couldn't see and you hit or I don't know who hit who, but you agree on a crossing with the [ILLUSTRIOUS] would put you dangerously close to the west bank where the fog was. You could have had the opportunity, couldn't you, to have made a different agreement with [the ILLUSTRIOUS], couldn't you?
WITNESS:
Well, in—
THE COURT:
Could you or could you not?
WITNESS:
Yes, sir, I could have.
THE COURT:

Certainly you could have.
WITNESS:
But [the ILLUSTRIOUS] initiated the agreement.
THE COURT:
That's right, but what is the rule of the road? Don't you have a right to change it?
WITNESS:
If it was dangerous, yes.
THE COURT:
You have the option?
WITNESS:
If it was some reason for me to consider it.
Transcript of McNeely Testimony at 72–73.