Complaint of VALLEY TOWING SER-
VICE as Owner of the M/V CITY of
GREENVILLE for exoneration from or
limitation of liability.

The VALLEY LINE COMPANY, et
al., Plaintiffs,

v.

The M/V CITY OF GREENVILLE and
Valley Towing Service, Inc.,
Defendants.

The M/V CITY OF GREENVILLE and
Valley Towing Service, Inc.,
Third-Party Plaintiff,

v.

UNITED STATES of America,
Third-Party Defendant.

Nos. 83–1149A(1), 83–808A(1).

United States District Court,
E.D. Missouri, E.D.

Oct. 7, 1985.

See also, 609 F.Supp. 298.

Michael D. O'Keefe, Gary Mayes, Thompson & Mitchell, St. Louis, Mo., for Hilliard Lyons Barge Partners 1981–1, Marine Equipment Management Co., Plm River Barge Partners I, Valley Line Co., Sec. Barge Line, Peavey Co., Ins. Co. of North America, Northwestern Nat. Bank of Minneapolis, Flowers Transp. Co., Cro Marine Line Co.

Peter B. Hoffman, Kortenhof & Ely, St. Louis, Mo., for Eagle Marine Industries.

Paul B. Lee, Lucas & Murphy, St. Louis, Mo., for Slay Warehousing Co.

John S. Sandberg, Shepherd, Sandberg & Phoenix, St. Louis, Mo., William E. O'Neil, Michael W. Lodwick, Barham & Churchill, New Orleans, La., for Dravo Mechling Corp., The Pillsbury Co.

John J. Morton, Asst. City Counselor, St. Louis, Mo., for City of St. Louis.

Elmer Price, Hubert I. Binowitz, Goldstein & Price, St. Louis, Mo., for Monsanto Co., Consol. Grain & Barge Co., and American River Transp. Co.

Richard F. Johnson, Warren C. Ingersoll, Lord, Bissell & Brook, John Scott Hoff, Lapin & Hoff, Chicago, Ill., Frank N. Gundlach, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for plaintiffs.

Paul B. Lee, St. Louis, Mo., for Archway Fleeting & Harbor Service.

## MEMORANDUM

NANGLE, Chief Judge.

This admiralty action is a consolidation of two separate actions which arose out of an accident on April 2, 1983, wherein the tow CITY OF GREENVILLE struck the Poplar Street Bridge in the St. Louis Harbor. Numerous claims were filed in connection with the accident. The only remaining claims, however, are those of Slay Warehousing Company, Inc., d/b/a Archway Fleeting & Harbor Service and E.P. Slay and Joan Slay against The Valley Towing Service, Inc. for damages.

This case was tried to the Court sitting without a jury. This Court having considered the pleadings, the testimony of the

witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. *Fed.R.Civ.P.* 52.

## FINDINGS OF FACT

1. At all material times, claimant Slay Warehousing Company, Inc. was a corporation duly organized and existing under law.

2. At all material times, E.P. Slay and Joan Slay were residents of the City of St. Louis, Missouri.

3. Slay Warehousing Company, Inc. d/b/a Archway Fleeting & Harbor Service (Archway) operated a fleeting facility known as the Cahokia fleet, located on the left bank of the upper Mississippi River at mile 178. Also, Archway owned barges MV–615 and M–19.

4. At all material times, E.P. Slay and Joan Slay were the owners of a facility known as the Cahokia Power Plant, which is also located at mile 178 of the upper Mississippi River.

5. At all material times, Valley Towing Service, Inc. was a corporation duly organized and existing under law.

6. At all material times, Valley Towing Service, Inc. maintained its principal offices in Memphis, Tennessee, and was engaged in the business of owning and operating towboats along the inland river system, which included the upper Mississippi River.

7. At all material times, Valley Towing Service, Inc. was the owner and operator of the M/V CITY OF GREENVILLE, which is a river towboat used to transport barges on the rivers of the United States.

8. At all material times, Valley Towing Service, Inc. was also the owner of petroleum barges V–882, V–883, V–884, and V–885.

9. Prior to the collision on April 2, 1983, barges V–882, V–883, V–884, and V–885 were loaded with Wyoming sour crude oil. They were in the tow of the M/V CITY OF GREENVILLE on the upper Mississippi River, and were headed southbound from a dock at Wood River, Illinois toward the St. Louis Harbor.

10. All southbound river traffic in this area encountered a gradual bend in the river. The curve extends from left to right above the Veterans Bridge in the St. Louis Harbor to below the MacArthur Bridge. The Poplar Street Bridge is within the bend.

11. The Poplar Street Bridge spans the upper Mississippi River at mile 179.2. The center span, which is also the main channel span of the bridge is marked for downbound traffic with one green light and three white lights arranged in a vertical line. On the evening of April 2, 1983, the top white light immediately below the green light, marking the center of the channel was not functioning.

12. The river stage on April 2, 1983 was 27.5 feet, which is near flood stage.

13. The captain and master of the M/V CITY OF GREENVILLE was Benny Pope. Captain Pope was at the controls and in charge of the navigation of the tow as it entered the St. Louis Harbor on the night of April 2. As the M/V CITY OF GREENVILLE approached the Poplar Street Bridge, the starboard side of the string of barges in the tow came into contact with a pier of the bridge. Barges V–882, V–883, and V–884 caught fire and broke away from the M/V CITY OF GREENVILLE.

14. Captain Pope's testimony that the accident was due to the failure of the top white light marking the channel span is not credible. The channel span was clearly visible from the Eads Bridge, which must be navigated before a tow can be aligned for the Poplar Street Bridge.

15. The true cause of the collision is that the starboard set of the current immediately above the Poplar Street Bridge was much greater than the Captain anticipated. As a result, the Captain maneuvered his vessel abruptly and misaligned the tow with respect to the bridge.

16. On April 2, 1983, the Cahokia fleet mooring facility consisted of two fleet barges, MV–615 and M–19. The two fleet barges were affixed to the bank with a large anchor chain and wire which ran from fleet barge MV–615 to a concrete "deadman" located adjacent to the bank.

17. On the same date, there were 11 barges moored in Archway's Cahokia fleet in addition to the fleet barges.

18. Upon breaking loose from the M/V CITY OF GREENVILLE, the three burning barges drifted down river, spilling burning oil along the way. One or two of the barges struck the head of the Cahokia fleet and caused the fleet to break away from its moorings.

19. Barge V–883 became lodged in a cove directly above the Cahokia Power Plant and adjacent to the concrete retaining wall just north of the power plant. The barge continued to burn.

20. After burning for a period of approximately two hours in the cove, barge V–883 topped westwardly around the concrete retaining wall north of the power plant and bumped down the concrete river wall of the Cahokia Power Plant. The current was moving toward the concrete river wall and the wind held the barge against the wall of the power plant. Lighted cargo continued to escape from the barge, and burned on the surface of the river immediately adjacent to the concrete river wall. This cargo left its mark on the wall which demarks the water line of the river on April 2.

21. The Cahokia Power Plant is of brick masonry construction, and is located adjacent to the Mississippi River. The brick masonry sits upon a concrete river wall which extends for approximately 510 feet. The concrete wall reaches into the waters of the river. Prior to April 2, the face of the concrete wall contained three ladders which had been used by Archway to gain access to barges moored at the Cahokia facility. Also, on the face of the concrete river wall was a twenty-four inch copper gutter which ran the length of the wall. In addition, there were three pipe elbows which protruded from the face of the wall and ran into the gutter.

22. The three ladders located on the concrete river wall were rusted and in poor condition prior to the accident, due to previous collisions. The ladders were rendered unusable as a result of the M/V CITY OF GREENVILLE accident, however.

23. The twenty-four inch copper gutter had sustained some damage as a result of previous collisions. The gutter had once been used as a waste removal device for materials from the power plant. The Slays had no particular use for the gutter in April of 1983, however. The gutter was severely damaged as a result of the collision involving V–883 and the accompanying fire.

24. Prior to the accident in question, there was a significant amount of spalling and cracking of the concrete coating on the face of the river wall. This spalling and cracking was both above and below the water line of April 2, 1983.

25. The contact between V–883 and the river wall resulted in additional spalling to the wall. This is evidenced by the fact that significantly more spalling appears above the water line of April 2, 1983, than below it. In addition, concrete chips found in the gutter shortly after the accident were of recent origin. Heat is a cause of concrete spalling, and there was an intense fire adjacent to the wall on April 2. Plaintiffs' own expert testified, however, that approximately twenty percent of the spalling on the wall could have been a pre-existing condition.

26. Sitting above the concrete river wall is the brick masonry wall of the power plant. The wall is cracked in numerous places, particularly above the windows. Most of the cracks were pre-existing at the time of the accident and are attributable to the lack of expansion joints in the brick masonry. Some of the cracks, however, were caused by collisions with the concrete river wall on the evening of April 2, 1983.

27. Shortly before trial, plaintiffs discovered damage to an area of the power

plant known as the cold water intake. The damage included smoke and soot stains to the ceiling, exposure of steel rebars, as well as spalling on the ceiling. None of this damage is attributable to the M/V CITY OF GREENVILLE, however.

28. Because barge V–883 remained burning in the vicinity of the Cahokia Power Plant for in excess of two hours, the power plant and concrete wall sustained smoke and soot damage. All of this damage is directly attributable to the fire. The surrounding grounds sustained smoke and soot damage from the fire, as well.

29. Plaintiffs presented testimony that the cost of removing the smoke and soot from the brick masonry walls and the concrete walls of the Cahokia Power Plant is $69,500.00. There was testimony, however, that the facilities could be cleaned for half that cost. The cost of cleaning the oil and soot from the surrounding grounds is $3,750.00.

30. Archway owns two vessels, the M/V JANET ELAINE and the M/V KATIE, which were in the waters of the Mississippi on the night of April 2, 1983. The hulls of these vessels were exposed to the burning oil in the river and required cleaning. The cleaning was done by Archway, at a cost of $5,000.00.

31. The two fleet barges M–19 and MV–615 each sustained damage in the amount of $8,000.00. The scrap value of the barges, however, is only $3,500.00 to $4,000.00 each, although James Manley, a marine surveyor testified that the barges had a use value of $4,500.00 each.

32. Merrill Marine Service at Archway's direction, surveyed the damage to the two fleet barges. In addition, at Archway's request, Merrill Marine surveyed damage at other facilities down the river caused by collisions involving barges which had been moored at Archway. The total survey expenses incurred by Archway was $11,870.70. A separate invoice was not sent to Archway for the survey of the fleet barges alone, however.

33. Archway Fleeting & Harbor Service also sustained damage in the amount of $1,735.00 in expenses for relocating the deadman at the Cahokia fleet, and for reattaching the anchor chain to the deadman. This amount constitutes a fair and reasonable expense which was incurred as a direct result of the accident.

34. As another direct result of the incident, Archway Fleeting & Harbor Service lost the use of the Cahokia fleet for a period of 120 days. During 1981, 1982 and 1984, Archway averaged the fleeting of eleven barges per day in the Cahokia fleet. During 1983, Archway charged a daily rate of $23.00 per day for the fleeting of a barge, and earned a net profit of $17.05 per barge day. Archway contends that it would have earned $22,506.00 in profits during the 120 day period that its fleet was out of commission. Twelve cents per barge was saved in maintenance expenses as a result of not operating the fleet, however.

## CONCLUSIONS OF LAW

■ This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1333, which is admiralty jurisdiction. The appropriate substantive law to be applied is federal maritime law. *Kermarac v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). Venue is proper in the Eastern District of Missouri.

■ Plaintiff Archway asserts that defendant Valley Towing Service is liable to it for all losses sustained as a result of the barge accident on the evening of April 2, 1983. Plaintiff asserts that defendant's liability stems from its negligent operation of the M/V CITY OF GREENVILLE. Once fault is determined, however, it is necessary for plaintiffs to establish their entitlement to each item of damage claimed.

■ This Court concludes that defendant Valley Towing was indeed negligent with respect to its operation of the M/V CITY OF GREENVILLE. When a moving vessel collides with a stationary object, a pre-

sumption of fault arises that the moving vessel is at fault. Such presumption, in the absence of adequate proof to the contrary suffices to establish a prima facie case of fault. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *Petition of M/V ELAINE JONES,* 480 F.2d 11, 17 (5th Cir. 1973). That presumption was not rebutted by defendant in the instant case, however.

■ The captain of a vessel is chargeable with knowledge of all navigational conditions reasonably ascertainable by mariners experienced in navigating a particular waterway. In this instance, Captain Benny Pope admitted that he misjudged the magnitude of the right hand set at the Poplar Street Bridge. Nor is the malfunctioning of the top white light on the Poplar Street Bridge sufficient to relieve Valley Towing of liability. The green light which marks the center span of the channel was clearly visible, and the pilot James Miller, who was present in the pilothouse with Captain Pope shortly before the accident testified via deposition that he had no trouble spotting the lights marking the main channel span. Furthermore, two other vessels safely navigated beneath the Poplar Street Bridge immediately prior to the accident. These factors lead the Court to conclude that Captain Pope was negligent in directing the M/V CITY OF GREENVILLE through the St. Louis Harbor. He was relatively unfamiliar with the sets and drafts of the St. Louis Harbor, failed to take the correct course through the harbor, and was unable to locate the main channel span of the Poplar Street Bridge.

This negligence on behalf of Captain Pope is directly attributable to Valley Towing Service. Furthermore, the negligence was the proximate cause of some of the claimed damage to the Archway Fleeting facility. As a direct result of this negligence, the fleet barges M–19 and MV–615 were damaged. Such negligence also constituted the direct and proximate cause of the inability to locate the deadman and reattach the anchor chain for 120 days; the diminution in Archway's profits due to the lost use of the Cahokia fleet for 120 days;

the oil damage to the hulls of the M/V JANET ELAINE and M/V KATIE; some structural damage to the Cahokia Power Plant and adjoining concrete river wall; the smoke damage to the power plant; and the appearance of smoke, oil and debris on the grounds adjacent to the river surrounding the power plant.

■ In admiralty, damages are awarded as a result of negligence in accordance with the principal of *restitutio in integrum.* Property owners are to be compensated fully for all losses incurred, in a manner which will restore them to the condition which would have existed had the casualty not occurred. *Standard Oil Co. v. Southern Pacific Co.,* 268 U.S. 146, 155–56, 45 S.Ct. 465, 466–67, 69 L.Ed. 890 (1924); *Zanzibar Shipping, S.A. v. Railroad Locomotive Engine No. 2199,* 533 F.Supp. 392, 394 (S.D.Tex.1982). Thus, this Court shall consider each of plaintiff's damage claims in accordance with this principal.

■ Archway first asks for an award of $16,000.00 for the fair and reasonable cost to repair the damages to fleet barges M–19 and M–615. While the $16,000.00 does constitute a fair and reasonable cost to repair the damage, these repair costs exceed the value of the barges. Under such circumstances, plaintiff is only entitled to the value of the barge at the time of the collision. *Zanzibar,* 533 F.Supp. at 394–95. While the barges had a scrap value of between $3,500.00 and $4,000.00 each, James Manley the surveyor testified that they each retained a use value as fleet barges of $4,500.00. This Court thus determines that the use value of the two barges is $4,500.00, and plaintiff is awarded $9,000.00 for the value of barges M–19 and MV–615. *See Missouri Portland Cement Co. v. Walker Barge Fleeting Service, Inc.,* 561 F.Supp. 12, 16 (W.D.Ky. 1982).

■ Archway next asks for $5,000.00 for the cost of cleaning the M/V JANET ELAINE and M/V KATIE. Archway performed the cleaning internally, but nonetheless is entitled to recover the cost of the

cleaning to itself. *See Baltimore & Ohio Railroad Co. v. Commercial Transport, Inc.*, 273 F.2d 447, 449 (7th Cir.1960). This cost is not in dispute and this Court has no indication that the cost is anything but fair and reasonable. Accordingly, Archway is entitled to recover $5,000.00 for the cost of cleaning the hulls of the M/V JANET ELAINE and M/V KATIE.

■■■■ Archway sustained damage in the amount of $11,870.70 for survey expenses. These expenses are not only for the survey of the two fleet barges, but also for surveys of barges and property not owned or operated by Archway. These surveys were ordered in anticipation of claims against Slay rather than damage actually sustained by Slay. A similar claim was considered by the court in *Matter of Ta Chi Navigation (Panama) Corp., S.A.*, 513 F.Supp. 148, 155 (E.D.La.1981), which held that the survey costs of adjoining property were not recoverable as a damage. Such costs were rather deemed defense costs. Thus, plaintiff's claim for survey expenses to property not owned by Archway is not recoverable in this action. This Court denies Archway's entire claim for survey expenses as Archway made no showing as to what it expended on the surveys of the two fleet barges. Thus, the claim for $11,870.70 is denied.

■■■■ Plaintiffs next request an award of lost profits in the amount of $22,506.70 from the loss of use of the Cahokia fleet for a period of 120 days. The Court subtracts $.12 per barge per day, however, as there was testimony that this maintenance cost was saved by Archway in not operating the fleet. Thus, $158.40 may be subtracted from plaintiff's claim for lost profits. To warrant a recovery for lost profits, a plaintiff must present proof "sufficient to bring the issue outside the realm of conjecture, speculation or opinion unfounded on definite facts." *Cargill, Inc. v. Taylor Towing Service, Inc.*, 642 F.2d 239, 241 (8th Cir.1981). *See also Miller Industries v. Caterpillar Tractor Co.* 733 F.2d 813, 822 (11th Cir.1984); *Conticarriers & Terminals, Inc. v. Borg-Warner Corp.*,

593 F.Supp. 400, 403 (E.D.Mo.1984). This Court concludes that plaintiffs have established their anticipated lost profits within this standard. Although some of the barges slated for fleeting at the Cahokia fleet could have been sent to other fleets operated by Archway, the transfer would have caused operational problems in other fleets. In addition, the Cahokia fleet was uniquely suitable for certain types of barges. Although Archway did not factor in the expenses it would have saved apart from the maintenance fee in not operating the fleet, expenses would have increased for the operation of other Archway fleets. This Court is satisfied that Archway has sustained lost profits in the amount of $22,-347.60 as a result of the M/V CITY OF GREENVILLE barge accident.

■■■ There is no dispute that Archway incurred expenses in the amount of $1,735.00 for locating the deadman and reattaching the anchor chain. This amount is a fair and reasonable expense, and is thus awarded to Archway.

■■■ Archway next seeks $147,980.00 for the damage to the Cahokia Power Plant. This damage includes $23,940.00 for repair costs to the masonry wall, $12,-000.00 to repair pipe elbows, $4,800.00 to replace the steel ladders, $28,000.00 to replace the copper gutter and supports, $32,-400.00 to repair the spalled concrete river wall, $20,380.00 for contingencies, $12,-230.00 for overhead, and $13,450.00 in profit. In considering the evidence, however, this Court concludes that only one quarter of the damage to the power plant (apart from smoke damage) is the result of the barge accident on April 2, 1983. Plaintiffs' expert testified that twenty percent of the damage may have been due to a pre-existing condition. Defendants' expert testified on the other hand that virtually none of the damage resulted from the M/V CITY OF GREENVILLE accident. This Court does note that there was more spalling on the river wall above the river line of April 2 than below it, that some cracks in the brick masonry wall appeared to have been recent, that large chips of concrete of recent

origin appeared in the gutter, and that the ladders were serviceable although not in prime condition prior to the accident. In addition, the testimony of defendant's expert Mannie Siegel is discredited to a certain degree because he had no knowledge of the facts of the accident, and he inspected the vicinity over two years from the date of the accident. Based on these factors, this Court draws its conclusion that one quarter of the structural damage to the power plant is attributable to defendant's negligence.

The Court has authority to apportion the fault in the way it deems appropriate upon consideration of the evidence. *Valley Towing Service, Inc. v. S/S American Wheat, Freighters, Inc.*, 618 F.2d 341, 346 (5th Cir.1980). Admiralty is essentially the law of equity and courts are privileged to exercise flexibility and award what is fair. The hands of the court are not tied by the rigidity of common law. *Pizani v. M/V COTTON BLOSSOM*, 669 F.2d 1084, 1089 (5th Cir.1982). As three quarters of the damage to the power plant was the result of a pre-existing condition, this Court determines that Valley Towing is only liable for one quarter of the damage to the power plant, or for $36,995.00. Liability for damages among parties is clearly allocated proportionately according to the degree of fault. *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715, 44 L.Ed.2d 251 (1975); *Moran Towing & Transportation Co., Inc. v. City of New York*, 620 F.2d 356, 358–59 (2d Cir.1980). Thus, an award of $36,995.00 is fair and reasonable and within this Court's authority to award plaintiffs for damage to the power plant.

Archway additionally seeks damages for the expense of smoke removal from the power plant in the amount of $69,500.00. This Court does attribute the oily smoke on the power plant and river wall to the presence of the burning barge along the Archway facility on April 2. Yet, there was testimony that the smoke could be removed from the power plant for half of plaintiffs' estimated cost. This Court deems the figure $34,750.00 to be the fair and reasonable cost of removing the smoke from the power plant. Thus, this amount is awarded to Archway in damages.

Archway further asks for $3,750.00, as the cost of cleaning the debris from the grounds adjacent to the river and immediately north of the Cahokia Power Plant. The debris was clearly the result of the barge accident and the figure requested does constitute the fair and reasonable cost of cleanup. Thus, Archway is also awarded $3,750.00.

The final item of damage asserted by Archway is the damage to the concrete ceiling in the area known as the cold water intake immediately north of the Cahokia Power Plant. Archway seeks $10,000.00 for repairing the spalling on the ceiling. This Court does not view this as a credible claim, however. Although there was some smoke damage within the cold water intake area, the spalling on the ceiling was in the area farthest from the fire. In addition, exposed steel rebars on the ceiling indicate that the fire in the cold water intake was not hot enough to cause spalling on the ceiling. Steel beams sag at a much lower temperature than the spalling of concrete. Here, the beams were not misshaped. Furthermore, there was evidence of previous patching to the ceiling. Of major persuasion to the Court, however, is the fact that plaintiffs' expert did not even enter the cold water intake area until May of 1985 because he did not originally suspect damage in that area. Thus, Archway's claim for damages to the cold water intake area in the amount of $10,000.00 is denied.

The final matter of consideration is that of prejudgment interest. In admiralty, prejudgment interest should be routinely awarded in the absence of "peculiar circumstances". *Mid-America Transportation Co., Inc. v. Rose Barge Line, Inc.*, 477 F.2d 914, 916 (8th Cir.1973); *Conticarrier & Terminals, Inc. v. Borg-Warner Corp.*, 593 F.Supp. at 403. This Court believes that prejudgment interest is in order in this case and thus awards it at ten

percent from the date six months following the casualty, as stipulated by the parties. It is of no consequence that the repairs have yet to be made. *Demetrius Maritime Co., Ltd. v. S/T "Connecticut"*, 463 F.Supp. 1108, 1109–11 (S.D.N.Y.1979).

Therefore, this Court's judgment is that Archway is entitled to $113,577.60 plus prejudgment interest at ten percent from the date six months following the casualty.

## ORDER

Pursuant to the memorandum filed herein this day,

IT IS HEREBY ORDERED that judgment be and is entered for plaintiffs Slay Warehousing Company, Inc. d/b/a Archway Fleeting & Harbor Service, E.P. Slay and Joan Slay in the amount of $113,577.60 plus prejudgment interest at ten percent from the date six months following the casualty.

IT IS FURTHER ORDERED that defendant's objections to deposition testimony offered by Slay and Archway be and are overruled.

IT IS FURTHER ORDERED that defendant's objections to exhibits offered by Slay and Archway be and are overruled.

IT IS FURTHER ORDERED that plaintiffs' objections to exhibits of Valley Towing Service, Inc. be and are overruled.

The Court did not rely upon any of the objectionable exhibits or deposition testimony in rendering its Findings of Fact or Conclusions of Law.